Thornton *vs.* Lane.

| 11 | 459 |
| 85 | 265 |

| 11 | 459 |
| 110 | 75 |
| 110 | 718 |

| 11 | 459 |
| 114 | 280 |

| 11 | 459 |
| 117 | 967 |

| 11 | 459 |
| 123 | 792 |

| 11 | 459 |
| 125 | 726 |
| e125 | 728 |
| 125 | 729 |

No. 64.—Dozier Thornton, plaintiff in error, *vs.* Richard A. Lane, defendant in error.

[1.] Parties are not entitled, as *of right,* to re-argue upon another writ of error, points which have been already solemnly adjudicated.

[2.] At Common Law, upon the dissolution of a corporation, the debts due to, and from it, are extinguished.

[3.] The 11th section of the charter of the Planters' & Mechanics' Bank of Columbus, provides that, "the persons and property of the stockholders, shall be pledged and held bound in proportion to the amount of shares and the value thereof that each individual or company may hold in said bank, for the *ultimate redemption* of the bills or notes issued by said bank, in the same manner as in common actions of debt; and no stockholder shall be relieved from such liability by sale of his stock, until he shall have caused to be given sixty days' notice of said sale, in some public gazette of this State. *Held,* 1st. That the liability of the stockholder to the bill-holder for the

Thornton *vs.* Lane.

*ultimate redemption* of the notes of the corporation, survives the dissolution of the charter, and is not extinguished by the judicial forfeiture of the same.

2dly. That this is a statutory liability, *in the nature of a specialty*, and is not barred until twenty years.

3dly. That the value of the stock is to be estimated according to the valuation put upon it by the second section of the charter, to wit: one hundred dollars per share.

4thly. All the stockholders who have given notice, in terms of the Act, are exempt, unless the failure occurs within six months thereafter. All other stockholders are liable for the redemption of the bills, whether they have transferred or not.

5thly. That a judgment, *fi. fa.* and return of *nulla bona*, in a suit against the corporation, or its assignee, is sufficient to authorize the bill-holder to proceed against the stockholder personally.

[4.] What is *authority* in this State, and what *opinion* merely.

[5.] Where the declaration is upon a domestic judgment, rendered in a Court of Record, the plea of *nul tiel record* should conclude with a verification to the Court only:—*aliter*, where the writ is upon a foreign judgment, or a judgment rendered by a Court which is not a Court of Record.

[6.] The plea of *nul tiel record*, can only be pleaded to a record which is the gist or foundation of the action, and not to a record which is stated as inducement only.

[7.] A Judge may *confess* a judgment against himself, in a suit in his own Court, to which he is a party.

[8.] A party is not *estopped* from denying any *fact* which is recited in a legislative Act; but although such recitals are not *conclusive*, they should be treated as true until the contrary appear.

[9.] A party who is sued and confessed judgment against himself in a particular character, is foreclosed from afterwards denying that character.

[10.] Where the legal effect of the judgment and execution is the same, any verbal variance is immaterial.

[11.] The indorsement on the execution by the Sheriff, of "no property found in my County on which to levy," is not *prima facie* evidence even that the *fi. fa.* was returned on the same day.

[12.] The time of the return of the execution, is a fact *in pais*, and may be proven by *parol*.

[13.] The Sheriff may enter *nulla bona* on the *fi. fa.* and put it in his pocket and keep it till the return term, to which it is made returnable.

[14.] If a Sheriff or Constable, having in his hands a *fi. fa.* has made one full examination for goods without effect, he may return the execution *nulla bona*.

[15.] In a suit against one of several debtors, the plaintiff may call either of the others as a witness for him.

Thornton *vs.* Lane.

[16.] In an action by the bill-holder against the stockholder, a transfer of stock made on the books of the bank, by the cashier of the corporation, of which the defendant was a member at the time, and free access being secured to him by law for the purpose of inspecting said books, is *prima facie* evidence of his ownership of the shares.

[17.] Will the defendant be permitted to repudiate the transfer, without verifying his plea? *Quere.*

[18.] The fact that a man is *insolvent* when he transfers his effects, does not make the conveyance void; and the same rule applies to corporations or artificial persons, as to natural.

[19.] It is not only the privilege, but the duty of the Court to state the legal effect of testimony when called on to do so by the Jury. The construction of the law arising from undisputed facts, is undoubtedly within the jurisdiction of the Court.

[20.] It is not error in the presiding Judge to say to the Jury, that the privilege and responsibility of rectifying errors of law, which may be committed by the Court, did not rest with them, but that the Constitution of the State had conferred this power elsewhere.

[21.] It is no error in the Judge to instruct the Jury, that they were bound to regard the law, as stated by him, to be the law of the case. This Court has been vigilant from its first organization, in protecting the just rights and privileges of the Jury, from any encroachment from the Bench.

[22.] Where verdicts were manifestly against evidence, they have not been permitted to be disturbed, unless they evinced by their gross injustice, passion, partiality or prejudice.

[23.] This Court will be equally vigilant in upholding the powers of the Court. The right of the Court to decide upon the law, shall never be impaired or questioned. And if the Jury decide the law differently from the Court, a new trial will be awarded, *toties quoties.*

[24.] The oath administered to a Special Jury on appeals in Common Law cases, is that which was originally prescribed for the Jury in *Equity* causes.

[25.] The word *equity* in the oath administered to the Special Jury, is synonimous with *law,* and does not mean some undefined and undefinable notion which the Jury may entertain of the justice of the case, but a system of jurisprudence, governed by established rules, and bound down by fixed precedents. The Special Jury is sworn to try the cause according to equity and the *opinion* they entertain of the evidence, and not *their opinion* of *equity,* as well as the *evidence.*

Debt, &c. in Muscogee Superior Court. Tried before Judge Iverson, at November Adjourned Term, 1851.

This was an action brought by Richard A. Lane, against Do-

zier Thornton, as one of the stockholders of the Planters' & Mechanics' Bank of Columbus, to enforce his ultimate liability to redeem the bills issued by the said bank.

To this declaration, defendant below filed the following pleas :

1st. And now at this Term comes the defendant, by Hines Holt, his attorney, and defends the wrong and injury, when, &c. and for plea and answer saith, that he does not owe in manner and form as the said plaintiff in his said declaration hath declared against him, and of this he puts himself upon the country, &c.

2nd. And for further plea in this behalf this defendant saith, *actio non.*

Because, he says, that if he ever did owe in manner and form as the said plaintiff has declared against him, the said several causes of action in said declaration mentioned, did not, nor did any of them happen or accrue to the said plaintiff, at any time within six years next before the commencement of the said actions, and this he is ready to verify. And whereof he prays judgment of the Court, and puts himself upon the country, &c.

3d. And for further plea in this behalf, this defendant saith, *actio non.*

Because, he saith, that if he .ever did owe as said plaintiff hath declared against him, the right of action therefor accrued and happened to said plaintiff upon the failure of the said Planters' & Mechanics' Bank of Columbus, and upon the forfeiture of the charter thereof, and that more than six years elapsed between the happening of said events and the commencement of said action. Wherefore, he saith that the same is barred by lapse of time, and therefore he prays judgment of the Court and puts himself upon the country, &c.

4th. And for further plea in this behalf this defendant saith, *actio non.*

Because, he saith, that if he ever was a stockholder, and as such ever held and owned in his own right or otherwise, any stock in the said Planters' & Mechanics' Bank of Columbus, as in plaintiff's said declaration alleged, all his rights, interests and liabilities as such stockholder, ceased, determined, and became

extinct, upon the rendition of the following judgment of forfeiture, against the said Planters' and Mechanics' Bank of Columbus—bearing date on the 13th day of June, 1843; and found upon writ of *quo warranto,* sued out against said bank in the Superior Court of said County of Muscogee, all which will more fully appear by the evidence of the same, herewith submitted, to wit:

" It is considered by the Court here, that the liberties, privileges and franchises, to wit: that of being a body politic and corporate by the name and style of the Planters' and Mechanics' Bank of Columbus, heretofore used, enjoyed and exercised by the defendant, be seized into the hands of the State, and that the said defendant do not in any manner hereafter intermeddle, use, have, enjoy or exercise any of the liberties, franchises or privileges, of a body politic or corporate, but that the said defendant be absolutely forejudged and excluded from holding, using or exercising any of the privileges, franchises or liberties of a body politic or corporate, and that the State recover its costs to be taxed."

And this defendant saith, that with and by virtue and force of said judgment of forfeiture, rendered as aforesaid, and which is still subsisting and unreversed, and of full force and effect, all debts due to and from the said Planters' and Mechanics' Bank of Columbus were extinguished.

Wherefore, this defendant pleads the same in bar of his liability on said stock, in any manner or form, and in bar of the said plaintiff's right of recovery, and thereof prays judgment of the Court, and puts himself upon the country, &c.

5th.   And for further plea in this behalf this defendant saith, *actio non.*

Because, he saith, that if he ever was a stockholder in said Planters' and Mechanics' Bank of Columbus, as in said plaintiff's suit alleged, all his rights, duties and liabilities as such stockholder, except so far as the same are reserved and continued by public Acts of the Legislature of the State of Georgia, ceased, determined and became extinct upon the rendition of the judgment of forfeiture, as in the 4th above plea mentioned.

Thornton *vs.* Lane.

And because he saith, that by the same judgment of forfeiture, except so far as the same is reserved and continued by the aforesaid Acts of the Legislature, the debt of the said plaintiff and all right or rights of action thereon became extinguished. And this defendant saith the said judgment of forfeiture was executed by the delivery of the assets of said bank to said assignee, as provided, and the acceptance by said assignee of all the powers and duties conferred by said Acts of the Legislature.

Wherefore this defendant pleads the same, to wit: the said judgment of forfeiture, and the said Acts of the Legislature in bar of the said plaintiff's suit, and thereof prays judgment of the Court, and puts himself upon the country, &c.

6th. And for further plea in this behalf this· defendant saith, *actio non.*

Because he saith that he is not, nor was he at the time of the commencement of said plaintiff's suit—nor was he when said right of action accrued—nor was he when the debts upon which the same is founded, were contracted—nor had he been for more than six years prior to either and each of said events, a stockholder in the said Planters' and Mechanics' Bank of Columbus, in any manner or form. Wherefore he saith that he is not in any manner liable to said plaintiff's suit, and therefore puts himself upon the country, &c.

7th. And for further plea said defendant saith, *actio non.*

Because he says that if he ever did owe in manner and form as said plaintiff hath above thereof complained against him, said causes of action, nor any of them did not accrue within four years next before the commencement of said plaintiff's suit, and this he is ready to verify, and therefore puts himself upon the country, &c.

8th. And for further plea in this behalf this defendant saith, *actio non.*

Because he says, that if he ever was at any time a stockholder in the said Planters' and Mechanics' Bank of Columbus, and as such, held any number of shares therein, the following is the account of his ownership thereof, as existing upon the books of said bank, showing the dates of its transfer to him, to wit:

Thornton *vs.* Lane.

February 20, 1838.—To stock transferred by M. W. Turner, 50 shares.
March 28, 1838.—To    "        "        " A. B. Ragan, 50 shares.

and defendant farther says that he never owned, had, or held any other or further number of shares in said bank, than said one hundred shares as aforesaid, and if the books of said bank show any other or further transfer of shares of said bank stock to this defendant, to wit : a transfer on the 19th day of May, 1838, by Hines Holt, of 188 shares of said bank stock, and Walter T. Colquitt, of 188 shares of said bank stock, transferred to the name of the defendant, the same was so transferred by said Colquitt and Holt, at the instance of, and for the sole and exclusive benefit of one Daniel McDougald, and without the knowledge or consent of the defendant, and the same was so known to be the fact, then and there, by the directors and officers of said bank, and the defendant never did assent to the same. Defendant further says, that he never voted on said last mentioned stock, nor did any other act in relation to said last mentioned stock, by which his assent to such transfer could or can be implied, and so the defendant says, that he never owned, had or held, said three hundred and seventy-six shares of bank stock, so transferred by said Holt and Colquitt, to his name, as aforesaid, at the instance of said McDougald, and without the defendant's knowledge or assent as aforesaid, nor is he in any manner liable therefor, all of which he is ready to verify, and therefore puts himself on the country, &c.

9th. And for further plea in this behalf, this defendant saith, *actio non.*

Because, he saith, that if he ever was a stockholder in said Planters' and Mechanics' Bank of Columbus, he became such stockholder, not by original subscription for said stock, nor by purchase in any manner, form, or by any contract with said bank, but by transfer from the persons named in the 8th above plea, herewith submitted, and that the said persons who so transferred said stock to him, if any liability exists thereon which can be enforced by the said plaintiff, remain subject to said liability, they not having given notice of said transfer, and the failure of said bank having occurred within six months of the date there-

VOL XI 59

Thornton *vs.* Lane.

of; and therefore he saith that said transfers to him were not made in pursuance of the provisions of said bank charter, and so far as concerns the rights of the said plaintiff, are void.

Whereof this defendant saith, that he is not liable on said stock to the said plaintiff's demand, and thereof he puts himself upon the country, &c.

10th. And for further plea in this behalf, this defendant saith, *actio non.*

Because, he saith, that if he ever did own and hold in his own right, or otherwise, any number of shares of stock in the Planters' and Mechanics' Bank of Columbus, that said bank, while he owned and held the same, and when the said plaintiff's right of action accrued, and when the same was instituted, was not insolvent, nor is the same now insolvent, but on the contrary thereof, the same had during all the time aforesaid and still has assets and effects altogether ample and sufficient to redeem all its bills and notes, without resorting to the ultimate liability of its stockholders, as provided by its charter, for the redemption and payment thereof. For this defendant saith, that there remained unpaid from the stockholders of said bank, at the time of the debts of said plaintiff accruing, and at the time of the dissolution of the charter thereof, and at the time of the commencement of said actions, and is still unpaid as assets, and first liable to the payment of said demands and to be exhausted before the ultimate liability of this defendant is fixed, as sought to be enforced in said actions, the sum of seventy-five dollars on each and every share of the stock thereof, making in the whole amount thus due, the sum of seven hundred and fifty thousand dollars, to wit: the sum of seventy-five dollars per share, on twenty-five shares, by John Banks; the like sum on forty-five shares, by T. R. Gould, and on one share, by W. S. Chipley, and on one hundred shares by W. B. Ector, and on twenty shares by Abraham Key, and on fifty shares by J. B. Ghent, and on fifty-two shares by J. M. Foster, and on one hundred shares by H. T. Greenwood, and on one hundred shares by Thomas Berry, and on four hundred and ten shares by D. McDougald, and on one hundred shares by John Page, and on fifty shares by Hardy Crawford, and on

Thornton *vs.* Lane.

one hundred shares by John Peabody, and on one hundred shares by Lucas and Brooks, and on one hundred shares by Robinson and Marks, and on one hundred shares by Henry Harris, and on one hundred shares by Alexander J. Robison, and on thirty shares by James M. Chambers, and on three hundred shares by George Smith, and on fifty shares by Rhodom Green, and on one thousand seven hundred and fifty-three shares by James C. Watson, and on four hundred shares by Thos. W. Watson, and on one hundred shares by Holt and Persons, and on four hundred shares by D. P. Hillhouse, and on thirty shares by A. H. Flewellen, and on one hundred shares by Joel Hurt, sen. and on thirty shares by W. Boyd, and on twenty shares by R. T. Marks, and on sixty-nine shares by W. W. Robinson, and on fifty shares by Wm. Boyd, guardian, &c. and on three hundred shares by Robert Watson, and on three hundred shares by James A. Slaton, and on two hundred shares by Wm. Taylor, and on one hundred shares by N. G. Wood, and on two thousand four hundred and forty-five shares by B. W. Walker, and one thousand two hundred and twenty-two shares by A. A. Hawley. And this defendant saith, that said stockholders are solvent and within the jurisdiction of the Court, own an amount altogether sufficient to discharge all the demands of whatsoever character due and owing by said bank, and that the said plaintiff hath not prosecuted his claims against said assets. And this defendant further saith, that the said bank, before the forfeiture of its charter, to wit: on the 6th day of May, in the year 1843, made an assignment to one Robert B. Alexander, for the benefit of its creditors, of all its property, assets and effects, amounting, exclusive of the sum due as aforesaid from its stockholders, to the sum of $391,340 93, all which will more fully appear by said deed of assignment, duly recorded, and duly recognized by Act of the Legislature of the State of Georgia, and that said property, assets and effects are all collectable and within jurisdiction of the Court, and are more than sufficient to discharge all debts due by said bank, and that the said plaintiff hath not prosecuted his claim against the same, and that said bank owes only the sum of $50,000. And this defendant further saith,

Thornton *vs.* Laue.

that there is due and owing to said Planters' and Mechanics' Bank of Columbus, by the late Western Bank of Georgia in the bills thereof, the sum of $40,000, which is collectable and within the jurisdiction of this Court, and that the said plaintiff hath not prosecuted his claim against the same, or levied on said bills.

And this defendant further saith, that there is real and personal estate belonging to said Planters' and Mechanics' Bank of Columbus, to the value of fifty thousand dollars, upon which the said plaintiff hath not levied his demand, and as part of the said estate there is the late banking house and lot occupied and owned by said bank at the time of the forfeiture of its charter, and a large three story brick building at the upper end of Broad street, in the City of Columbus, to wit: known as City lots, No. 186, and the north half of City lots, No. 183, and which is of the value as aforesaid, and which is subject to levy and sale under the said plaintiff's demand.

Wherefore this defendant saith, that his ultimate liability to the plaintiff's demand has not, if any exists, accrued, and of this he puts himself upon the country, &c.

11th. And for further plea in this behalf, this defendant saith, *actio non.*

Because he says, that if he ever did own and hold any stock in said bank, and in consequence thereof, is liable to the said plaintiff's demand, he is not liable to the extent claimed by said plaintiff in his said action, for he saith that the capital stock of said bank, if the same is estimated so far as concerns the said plaintiff's demand by the number of persons who held the same in similar circumstances with this defendant, was four million of dollars, and not one million, as provided by the charter, and that the liability *pro rata* of this suit is not as in said suit alleged, as the number of shares held by him is to one million of dollars, but as the same is to four million.

This plea farther set out the list of stockholders, during every six months of the existence of the bank, among which, did not appear the name of defendant. The plea concluded as follows:

Thornton *vs.* Lane.

And this defendant further says, that all and singular the transfer of said stock as set forth in this plea, was made by assignment and transfer, on the transfer books of said bank, and all and singular said assignment and transfer took place within six months prior to the failure of said bank, and while it was in the suspension of specie payment, and without giving, on the part of said stockholders and assignors as aforesaid, the sixty days' notice by publication in a public gazette of said State, as contemplated by the charter of said bank, in order to discharge such stockholders from liability on said stock, all of which he is ready to verify, and therefore puts himself on the country, &c.

12th. And for a further plea in this behalf, said defendant says, *actio non.*

Because, he says, that each and every one of the said stockholders, in the 11th plea mentioned, transferred the stock in said bank so by them held in said bank, as in said 11th plea more particularly set forth, and said Turner, Ragan, Holt and Colquitt, transferred said stock to them without giving the 60 days' notice of such transfer, in one of the public gazettes of this State, as required by the eleventh section of the charter of said bank, and that each and every of said stockholders so transferred said stock within six months prior to the failure of said bank. Whereupon this defendant saith, that to the extent that any shares of said stock may have been transferred to him, the same was transferred to him without being released or discharged of said liability, on the part of the assignor thereof to the bill-holders of said bank, and said liability attaching and remaining in such stockholders, does not in any manner attach upon such stocks in the hands of the defendant, assignee, as aforesaid, and of this he is ready to verify, and therefore prays judgment of the Court, &c. and thereof puts himself on the country, &c.

13th. And for a further plea, said defendant says, *actio non.*

Because, he says, that if at any time any of the stock of said bank was held in the name of this defendant, the same was transferred to him, and to his name, as particularly set forth in his foregoing plea, marked number 8, by A. B. Ragan, 50 shares, M. W. Turner, 50 shares, Hines Holt, 188 shares, and

Walter T. Colquitt, 188 shares, and that neither said Turner, Ragan, Holt or Colquitt, gave the sixty days' notice of the said transfer of their said stock, in any of the public gazettes of said State, as required by the eleventh section of the charter of said bank, in order to discharge themselves from liability as such stockholders to the said plaintiff or other bill-holders of said bank, and said Turner, Ragan, Holt and Colquitt, each and all of them, made said transfer of their said stock to this defendant, to the name of this defendant, as aforesaid, within six months prior to the failure of said bank, and remain liable to said plaintiff and the other bill-holders of said bank, upon said transferred stock, and so remaining liable, said liability cannot, and does not, attach to said stock so held and owned by this defendant, and so transferred into the name of this defendant, as in said 8th plea mentioned and set forth. Whereupon this defendant says he is not liable to said plaintiff upon all or any of said stock, and which he is ready to verify, and prays judgment of the Court, &c. and thereof puts himself on the country, &c.

14th. And for a further plea in this behalf, said defendant says, *actio non.*

Because, he says, there is no such record of judgment against said Robert B. Alexander, assignee of said bank, as is set forth in said plaintiff's declaration, and this he is ready to verify, and prays judgment of the Court, and thereof puts himself on the country, &c.

15th. And for further plea in this behalf said defendant says, *actio non.*

Because, he says, that if there is any such judgment against said Robert B. Alexander, assignee of said bank, as in said plaintiff's declaration mentioned, the same is null, void, and of no effect, for want of jurisdiction in the said Court rendering the same, for that said Robert B. Alexander, at the time of the rendition of said judgment, was the presiding Judge of said Court rendering the same, and presided in said Court as the Judge thereof at the rendition of said judgment, and as such Judge, rendered said judgment to said plaintiff, and so said defendant says said judgment is, and was, at the rendition thereof, null

and void, and this he is ready to verify, and prays judgment, &c. and thereof puts himself on the country, &c.

16th.   And for a further plea in this behalf, said defendant says, *actio non.*

Because, he says, that heretofore, to wit: on the 1st day of July, 1841, said bank suspended specie payment and failed, and after such failure said plaintiff with a full knowledge thereof, and without the consent of this defendant, procured said bank to re-issue and pass out from said bank to said plaintiff, the bills in said plaintiff's declaration mentioned, and this he is ready to verify, and prays judgment of the Court, &c. and puts himself on the country, &c.

17th.   And for further plea in this behalf, said defendant says, *actio non.*

Because, he says, that said plaintiff did not commence his said suit against said bank, or its said assignee, on all or any of the said bills in his said declaration mentioned, within six years next after the accrual of his cause of action therein against said bank, and this he is ready to verify, and prays judgment of the Court, &c. and puts himself on the country, &c.

18th.   And for a further plea in this behalf, said defendant says, *actio non.*

Because, he says, that at the time said plaintiff commenced his said action against the assignee of said bank as in said plaintiff's declaration mentioned, all and singular said causes of action against said bank were barred by the Statute of Limitations, of six years, and said assignee well knowing the same, and in fraud of the rights of this defendant, waived said Statute bar, and neglected to plead and insist upon said Statute, and confessed said judgment upon said causes of action barred by the Statute of Limitation as aforesaid, all of which he is ready to verify, and prays judgment, &c. and puts himself on the country, &c.

19th.   And for a further plea in this behalf, said defendant says, *actio non.*

Because, he says, that said plaintiff failed, refused and neglected to commence suits against said bank, or its assignee, on

said several causes of action in said plaintiff's declaration mentioned, for more than six years next from and after the accrual of his said cause of action against said bank, and that said assignee to the full end and term of six years, and for a long time thereafter, to wit : at and until the 1st day of January, 1846, had and held of the property and assets of said bank, and subject to the payment of said plaintiff's said demand, sufficient for the payment thereof, to wit : the personal property and choses in action in said tenth plea mentioned, and five thousand dollars in cash, and afterwards, and before the said judgment, against the said assignee in said plaintiff's declaration mentioned, said assignee wasted the same, and said assignee knowing that said plaintiff's claim was thus barred by the Statute of Limitation, and that he had no funds or property of said bank with which to pay the same, and with a view of rendering this defendant liable to said claim, colluded with said plaintiff and failed and refused to plead or insist upon said Statute of Limitation as a bar, and confessed said judgment to said plaintiff, all of which he is ready to verify, and prays judgment, &c. and puts himself on the country, &c.

20th.	And for further plea in this behalf said defendant says, *actio non.*

Because, he says, that said Robert B. Alexander, neither at the time of the commencement of said suit against him by said plaintiff, as assignee of said bank, nor at the time of the rendition of said judgment against him as such assignee, was not in truth and in fact, the assignee of said bank, and had no right or authority to be sued as such in the place and stead of said bank, which he is ready to verify, and prays judgment, &c. and puts himself on the country, &c.

HINES HOLT, Defendant's Attorney.

Before the cause was submitted to the Jury, the plaintiff demurred to, and moved to strike out as insufficient in law, and constituting no sufficient defence to plaintiff's demand, each and every of defendant's pleas as numbered, 1, 2, 3, 4, 5, 7, 9, 11, 12, 13, 14, and 15, and after argument had thereon, the presid-

ing Judge sustained said demurrer to each and every of said pleas, and ordered the same to be stricken out, which was accordingly done, and to which ruling and decision the defendant then and there excepted. The plaintiff then and there joining issue upon so much of the said defendant's plea, numbered 10, as set forth that there was real and personal property of said Planters' and Mechanics' bank, and specified the same, demurred to all those parts thereof which set forth the unpaid capital stock of said bank, and notes and other things in the hands of its assignee, &c. as assets against which plaintiff had not prosecuted his demand, &c. and after argument the presiding Judge sustained the demurrer and ordered plea (No. 10) to be stricken out to the extent to which the same was demurred to, which was accordingly done, and to which ruling and decision, defendant excepted.

The plaintiff having offered to join issue on pleas Nos. 1, 6, 8 and 16, and on that part of plea No. 10 not demurred to, as hereinbefore specified, the defendant before concluding said joinder, and before said cause was submitted to the Jury, by his counsel demurred to plaintiff's declaration, on the ground that there was no allegation therein averring that said Robert B. Alexander was ever appointed assignee of said bank, and no allegation showing that a judgment against the said Robert B. Alexander as such assignee, would be, was or is equivalent to a judgment against said bank, either by averment that the charter thereof had been judicially forfeited or otherwise surrendered, or by averment that the Act of the Legislature of the State of Georgia, assented to 23d December, 1842, entitled an Act to amend an Act to compel the several banks of this State to redeem their liabilities in specie, &c. was procured, accepted or assented to by said bank, or either or any of its stockholders; and also to the second count in said declaration, because the judgment against said Alexander, as assignee, is made the sole cause of action therein—no bills, notes, or other character of liability being set forth, other than said judgment, and that the said defendant is not liable thereon, that is to say, on said judgment. And after argument had on said demurrer, said Court overruled

the same, so far as it pertained to the first count in said declaration, holding and deciding that the appointment of said Alexander, as assignee of said bank, being made by Act of 1843, is sufficient to render a judgment against him, as assignee, equivalent to a judgment against said bank; to which ruling and decision the said defendant then and there excepted.

So far as concerned the demurrer to the second count in said declaration, the Court ruled that the same be sustained, and ordered said second count stricken therefrom, which was accordingly done.

The cause was then put before the Jury upon the issue taken, and that the said plaintiff offered and gave in evidence, the bank bills set forth in the first count of his declaration, and then offered in evidence the record of a suit, judgment and *fi. fa.* against Robert B. Alexander, assignee of said bank, with the entries and returns thereon.

The judgment and execution in this record, were as follows:

I confess judgment to the plaintiff for the sum of nineteen hundred and twenty-five dollars, with interest and cost, to be levied of the goods and chattels, rights and credits, lands and tenements of the said Planters' and Mechanics' Bank of Columbus.                    ROBT. B. ALEXANDER,
    Feb. 21st, 1848.                              *Assignee, &c.*

Whereupon it is considered and adjudged by the Court that the plaintiff do recover of the defendant, as assignee of the Planters' and Mechanics' Bank of Columbus, the sum of nineteen hundred and twenty-five dollars for his principal debt, and the sum of seven hundred and seventy dollars for his interest, and the sum of ten 50-100 dollars for his costs, to be levied of the goods and chattels, rights and credits, lands and tenements of said bank.                              WM. DOUGHERTY,
                                          *Plff's Att'y.*

    February 8th, 1848.

Thornton *vs.* Lane.

GEORGIA, MUSCOGEE COUNTY.

*To all and singular the Sheriffs of said State—Greeting :*

We command you that of the goods and chattels, lands and tenements of Robert B. Alexander, as assignee of the Planters' and Mechanics' Bank of Columbus, you cause to be made the sum of nineteen hundred and twenty-five dollars principal, and the further sum of seven hundred and seventy-seven dollars interest up to the 8th day of February, 1848, and also the further sum of ten dollars and fifty cents for costs, with interest on the principal sum from the 8th day of February, 1848, which Richard A. Lane lately in our Superior Court of said County recovered against the said defendant, as assignee of the Planters' and Mechanics' Bank of Columbus, for his principal, interest and cost; and that you have the said several sums of money before the Judge of our said Court on the second Monday in May next, to render to the said plaintiff the principal, interest and cost aforesaid, and have you there this writ.

Witness the Honorable Robert B. Alexander, Judge of our said Court.                              E. J. HARDEN, *Clerk.*

This, 18th day of Feb., 1848.

No property to be found subject to this *fi. fa.*

A. S. RUTHERFORD, *Sheriff.*

March 17th, 1848.

To the introduction thereof in evidence, the defendant objected, on the ground that in the then state of the pleadings, the same was irrelevant, relying amongst other things upon the positions that in said plaintiff's declaration it was alleged that the said Bank was still in existence, and that it was not alleged how, when or by what means Alexander became assignee, or that he was assignee with or without any such power as to deprive said bank of its franchises to sue and be sued and confer said right upon him.   The objection to the introduction of said records was sustained by the Court, and the same ruled inadmissible, and thereupon the plaintiff asked and obtained leave to

amend his declaration, and upon said leave, inserted as a part thereof the following:

| | |
|---|---|
| RICHARD A. LANE, | Debt, in Muscogee Superior |
| vs. | Court, at November Adjourned |
| DOZIER THORNTON. | Term, 1851. |

The plaintiff amends his declaration by leave of the Court, by adding the following account, to come in after the account on the second page of his declaration, to wit: Your petitioner further avers that on the thirteenth day of June, 1843, the charter of the said Planters' and Mechanics' Bank of Columbus was, by the judgment of the Superior Court of Muscogee County, on a writ of *quo warranto*, declared and adjudged forfeited and annulled by the following judgment of said Court, to wit: It is considered by the Court here that the liberties, privileges and franchises, to wit, that of being a body politic and corporate by the name and style of the Planters' and Mechanics' Bank of Columbus, heretofore used and seized and exercised by the defendant, be seized into the hands of the State, and that the said defendant do not in any manner hereafter intermeddle, use, have, enjoy or exercise any of the liberties, franchises or privileges of a body politic or corporate, but that the said defendant be absolutely forejudged and excluded from holding, using or exercising any of the privileges, franchises or liberties of a body politic or corporate, and that the State recover its costs to be taxed. And your petitioner further avers that by the Act of the Legislature passed on the 23d day of Dec. 1843, one Rob't B. Alexander was appointed and recognized as assignee and receiver of said Planters' and Mechanics' Bank of Columbus, with power to sue for any demand due to said Bank, and to be sued for any demand due from said Bank.

Upon said amendment being offered and received as part of said declaration, the defendant again demurred to the same as amended, as being in its then state insufficient in law to charge him, and as cause of demurrer amongst other things alleged:

1st. That said plaintiff in his said declaration showed that he had no cause of action either against said Bank, its assignee or

Thornton *vs* Lane.

its stockholders, or in any other form ; he having shown therein by setting forth said judgment of forfeiture so absolute and unqualified in its terms, and without any of the savings and exceptions contemplated and directed by the Act of 1842, and that the same was still subsisting and unreserved *its extinguishment.*

2nd. That said cause of action being thus extinguished by a judgment of forfeiture so absolute in its terms as that set forth by said plaintiff in his said declaration, the Act of the 23d December, 1843, could not and did not revive it, either in the hands of said assignee or in any other form.

3d. That if said plaintiff took or assumed to take any right of action or otherwise under said Act of 23d December, 1843, and the several Acts of which the same was amendatory, he must take said rights only upon the terms and qualifications of said Acts, and that by said Acts the right of action and recovery was in said assignee, upon terms in said Acts fully specified, and could not exist in or be prosecuted by said plaintiff. After argument had upon said demurrer the same was overruled. To which ruling and decision the defendant then and there excepted.

The defendant then to the declaration as amended pleaded the pleas as contained in the list of pleas hereinbefore copied and numbered 3 and 7, and stricken out upon demurrer when offered before the amendments to said declaration ; and also the several additional pleas found upon said list, and numbered 17, 18, 19 and 20; and thereupon the plaintiff demurred severally to each of said pleas numbered 3, 7, 18 and 20, and after argument upon said demurrer the same was sustained, and said pleas and each of them ordered to be stricken out, which was accordingly done. To which ruling and decision the defendant then and there excepted.

The plaintiff then read in evidence to the Jury the record of said suit against said Alexander, and the judgment thereon, with all the entries on the same, which is hereinbefore fully set forth. The plaintiff then proposed to read in evidence to the Jury said *fi. fa.* hereinbefore copied, with its entries. Thereupon the defendant objected to the reading of the same, amongst other things, because said *fi. fa.* did not follow and correspond with

Thornton *vs.* Lane.

the judgment and confession of judgment from which the same purported to issue, in this, that said confession and judgment was against the goods and chattels, rights and credits, lands and tenements of said bank, &c., therein specified to be levied thereon; and that said *fi. fa.* was against the goods and chattels, lands and tenements of Alexander, as assignee; and in this, that the return of *Nulla Bona* thereon was premature, having been made before the return day of said *fi. fa.* which objections were overruled, and to which defendant excepted.

The plaintiff then introduced as a witness in said cause, one Abraham B. Ragan, who being sworn, testified that he was Cashier of said Planters' and Mechanics' Bank of Columbus at its first organization, late in the winter or early in the spring of 1837, and that he continued in office until the spring of 1838; that the book offered and shown to him by the plaintiff's counsel was the transfer stock book of the Planters and Mechanics' Bank of Columbus, kept by the Bank for the purpose of transferring stock from one stockholder to another on said book. The witness proved the following transfers:

I, A. B. Ragan, do hereby assign and transfer fifty shares in the capital or joint stock of the Planters' and Mechanics' Bank of Columbus, to Dozier Thornton, Jr., for value received. In witness whereof, I have hereunto set my hand, in the town of Columbus, the 28th day of March, 1838.

A. B. RAGAN.

Witness, A. B. Ragan, *Cash'r.*

I, Hines Holt, Jr., do hereby assign and transfer one hundred and eighty-eight shares in the capital and joint stock of the Planters' and Mechanics' Bank of Columbus, to Dozier Thornton, Jr. In witness whereof, I have hereunto set my hand, in the town of Columbus, the 19th day of May, 1838.

HINES HOLT, Jr.

Witness, A. B. Ragan, *Cash'r.*

I, Walter T. Colquitt, do hereby assign and transfer one hun-

Thornton *vs.* Lane.

dred and eighty-eight shares in the capital or joint stock of the Planters' and Mechanics' Bank of Columbus, to Dozier Thornton, Jr. In witness whereof, I have hereunto set my hand, in in the town of Columbus, the 19th day of May, 1838.

W. T. COLQUITT.

Witness, A. B. RAGAN, *Cash'r.*

Witness testified that he transferred the fifty shares, and that he recognized his signature as a witness to the other transfers, and has no doubt they were made by Holt and Colquitt, as it was his duty as Cashier to witness such transfers, and he was not in the habit of subscribing his name as witness unless the transfers were made as recorded, but had no recollection of the same, or that defendant was or was not present when the same were made, or then or afterwards assented to them. He also testified that when said bank was organized all its stock was subscribed for, and that 25 per cent. thereon was paid; that a large portion of said payment was made in specie certificates of deposit given by the Bank of Columbus and the Insurance Bank of Columbus; that a committee of stockholders made arrangements with those Banks to give specie certificates for the notes and bills of the stockholders in the Planters' and Mechanics' Bank; that said bank did no business in 1837, and after its organization resolved to do none until the fall of that year, and a resolution was passed to discount the notes of its stockholders to the amount of their stock less about 2 per cent. for contingent expenses, respectively making said notes due 1st October, 1837; and that if said stockholders did not borrow upon these terms, others might, and this arrangement was carried out mainly if not entirely to stockholders; that the first bills issued by said bank were dated 6th February, 1838, and then were commenced to be put into circulation a week or ten days thereafter and then banking business commenced. When this banking business was determined upon and commenced, the stockholders and others who had given notes as before testified to, were required to pay in 50 per cent. thereon, which payment was made in bank bills of suspended banks, and not in specie. At the time bills were first

issued by said bank, it had but little specie on hand or in its vault, not exceeding $800 or $1,000. Said bank made three issues of bills in 1838, the first of $50,000, the second of $150,-000, and the third of $80 or 100,000. It commenced business as a suspended bank, and paid no specie whilst he was connected with it as Cashier, except small amounts for change. During the examination of said witness, defendant's counsel asked if there was not between 1837 and 1838 a change of stockholders and directors to a large extent; to which question plaintiff's counsel objected, and which objection was sustained—the Court deciding that the transfer book was higher evidence of that fact, and that it could not be proven by parol; to which ruling and decision defendant's counsel then and there excepted. Said witness further testified that Gen. Samuel A. Bailey was the first President of said bank, and that Gen. Daniel McDougald was President when the same commenced business in 1838. Before or about the time, and soon after said bank commenced business, McDougald purchased a large number of the shares of its stock, amounting in number to a majority of said stock, and witness knows that stock so purchased was transferred by direction of McDougald to or in the names of other persons; does not know that the shares transferred by Holt and Colquitt were purchased by McDougald.

He knows nothing of said transfers by Holt and Colquitt, except that he witnessed them, and this only from seeing his name as witness. He does not know that defendant was present or knew of said transfer. Witness further testified that he is now assignee or receiver of said Planters' and Mechanics' Bank of Columbus.

Defendant's counsel then asked witness whether, at the time the forfeiture of the charter of said bank occurred, 13th June, 1843, its assets were not sufficient to meet its liabilities, and whether he had not become satisfied of this fact, from knowledge of said assets, derived since his appointment as receiver, and whether said assets are not now to a large extent in his hands as receiver or assignee. To all the parts of said question and as an entire question, plaintiff's counsel objected,

and said objection was sustained, and to which ruling defendant's counsel excepted.

Defendant's counsel then asked said witness whether the unpaid capital stock and assets combined were not sufficient, by more than half a million of dollars, to pay all the debts and liabilities of said bank at the forfeiture of its charter; to which question, and the same being answered, plaintiff objected, and said objection was sustained by the Court, and to which defendant excepted. Witness further testified that he had in his hands, as assignee or receiver, promissory notes to the amount of $131,000, and $40,000 of the bills of the Western Bank of Georgia. Plaintiff's counsel then asked witness if said promissory notes had not been past due more than six years before he received the same; to which question defendant's counsel objected, and said objection was overruled, and thereupon defendant's counsel excepted. Witness then testified that all of said notes, except one for about $900, payable in the bills of the bank, had been past due more than six years before he received them; that he was appointed assignee at the May Term of this Court, 1851, and since then had received said notes and bills of Joseph A. L. Lee, who turned them over to him as the assignee of said bank.

Witness further testified that said bank, in 1838, built a banking house in said City of Columbus, on the west side of Broad street, and occupied the same up to the time of its final failure in the Spring of 1843. Since that time said banking house had been in possession of John Banks, the agency of the Bank of Brunswick, Alfred Iverson and others. Plaintiff's counsel then proposed to read in evidence to the Jury the three transfers hereinbefore copied from said transfer book, and to which defendant's counsel objected unless the whole book containing said transfers was offered and permitted to go in evidence, or so much thereof as either party chose to use as evidence before said Jury; which objection was overruled by the Court, and to which defendant's counsel excepted. Said three transfers were then read in evidence to the Jury. Said Ragan

also testified that said banking house and lot was worth from 12 to $15,000.

And be it further remembered, that the said plaintiff then read in evidence the record of an information in the nature of a *quo warranto*, against the Planters' and Mechanics' Bank, for the purpose of forfeiting its charter; by which the following judgment appeared to have been rendered:

THE STATE OF GEORGIA,
*vs.*  } Information in the nature of
PLANTERS' AND MECHANICS' BANK  a *quo warranto*.
OF COLUMBUS.

It is considered by the Court here, that the liberties, privileges and franchises, to wit, that of being a body politic and corporate, by the name and style of the Planters' and Mechanics' Bank of Columbus, heretofore used, enjoyed and exercised by the defendant, be seized into the hands of the State, and that the said defendant do not in any manner hereafter intermeddle, use, have, enjoy, or exercise any of the liberties, privileges or franchises of a body politic or corporate, but that the said defendant be absolutely forejudged and excluded from holding, using or exercising any of the privileges, franchises or liberties of a body corporate or politic, and that the State recover its costs to be taxed.

The plaintiff then closed his case, and the defendant introducing no evidence, the same was argued before the Jury, and after argument, the Judge charged the Jury amongst other things, that the transfer of stock in the stock book of said bank to the defendant, was *prima facie* evidence of his ownership thereof, and that it was not necessary to the plaintiff's recovery that he should prove the same by other evidence, or that he should prove defendant's purchase or subscription for the same, or his assent or knowledge of said transfers in his name or to him; that said transfer being made on the books of said bank, kept and used for said purpose, his assent thereto would be presumed; and that it was incumbent on the defendant to plead

and prove that he did not own the same, and that it was for the Jury to decide (if at all) how far the evidence had rebutted such presumptive evidence on the said transfer book, and if it had been rebutted, then the defendant was not liable as the owner of said stock.

The Judge further charged the Jury that said defendant was liable to billholders to the extent of the value of each and every share of stock held by him, and in proportion as the number of his shares is to the whole number of shares of the bank; and that said defendant after paying billholders in this proportion to the extent of the value of each and every of his shares, at $100 per share, could plead said payment in discharge of further claim by, or liability to other billholders, and that it was not necessary to the said plaintiff's recovery in his action, that he should aver and prove the extent of bills and notes issued by said bank and outstanding; that whether the same was $250,000, 1 million, or 3 millions, it made no difference as to defendant's liability; that when the defendant had paid billholders to the extent of his liability, such payment was ample protection against the claims upon him of other billholders; that the amount of bills and notes unredeemed by said bank was not an element in the calculation of the extent of defendant's liability to said plaintiff, and if it was, it was matter for plea and proof by said defendant, and not necessary to be averred and proven as part of said plaintiff's case, or in any manner necessary to his recovery. The Judge further charged the Jury that the defendant's liability as stockholder to said plaintiff accrued whenever the plaintiff's *legal remedies* against said bank for the payment of the bills held by him were exhausted, to wit, a judgment against the assignee and return of *nulla bona;* that it was not necessary for plaintiff to go into Equity to exhaust equitable assets or to pursue the assets in the receiver's hands (if any) before he could go upon the stockholder for a *pro rata* share of his debt.

The Judge further charged the Jury that the Act of the 23d December, 1843, expressly appointed Robert B. Alexander assignee of said bank, and that the same being a public law, it

was not incumbent on said plaintiff otherwise to aver and prove said appointment, and that the judgment against said assignee, *fi. fa.* and return of *nulla bona* thereon, was equivalent to the same being against said bank, and that a return of *nulla bona* on said *fi. fa.* against the assignee was *prima facie* evidence of the exhaustion of the property of said bank, but was not conclusive. If the defendant had shown that at the time of said return, there was property of said bank subject to levy and sale under said *fi. fa.* then said plaintiff must dismiss the suit against said defendant and proceed against said property, and could not maintain his action against defendant until he had exhausted such property.

The Judge further charged the Jury that the return of *nulla bona* on said *fi. fa.* against the assignee, even though made before the return day of the *fi. fa.* was *prima facie* evidence of there being no property upon which to levy the same, and that it was not necessary that the Sheriff should have retained in his hands said *fi. fa.* until the return day thereof.

The Judge further charged the Jury that if mere possession of the banking house and lot was relied upon by the defendant as *prima facie* evidence of title in said bank or its assignee, then such possession must have continued up to, or subsequent to the rendition of the judgment against said assignee; that in order for such possession to be any evidence of title, it was incumbent on the defendant to prove the same in said bank or the assignee, or that the persons in possession held under him or subsequent to the date of the judgment.

The Judge in the course of this charge to the Jury, amongst other things said, that the presiding Judge (the Court) was constituted by law the judge of the law in civil cases; that the Jury was bound to regard the law as stated by him to be the law of the case; that if he decided wrong, and the law provided a remedy or correcting tribunal, then his decision might be reviewed and corrected. If there was no corrective provided by law, then the parties would have to submit; but in either case it was wise and proper that the Judge should be entrusted with the power to determine the law, and that it was the province and

Thornton *vs.* Lane.

duty of the Jury to apply the law given in charge to them by the Court to the evidence, and find accordingly ; that in this case he (the Judge) had given them in charge the law of the case as he understood it.   The counsel on both sides had stated their views of the law and had claimed to give their honest opinions ; the Court had no doubt that they were sincere and honest in the expression of their opinions; he claimed however, to be equally sincere and honest in the opinions expressed by him ; that he was certainly indifferent in feeling to the parties, and had no earthly interest in the case, although he regretted to say that he had the evening before, received through the Post Office an anonymous letter, charging him with corruption, and being the partner of Mr. Dougherty in these bank cases, and threatening personal violence to him ; that he hoped none of the defendants to said bank cases had written that letter ; one thing was certain, no honorable man had written it; those are most apt to be suspicious who were themselves corrupt; he (the Judge) had important official duties to perform under the sanction of an oath—he would perform them fearlessly and to the best of his ability, no matter who was pleased or displeased thereby.

At the conclusion of the charge, and at the hour of 9 o'clock, A. M., the Jury retired to consider of their verdict, and after remaining in their room until 2 o'clock, P. M., again returned at their own request to the Court room, to receive the further instructions and charge of the Judge, and reported through their Foreman, that they disagreed as to the effect of the testimony of the witness Ragan, with regard to the assets turned over to him by Mr. Lee, and whether said testimony was ruled out or was before them for their consideration.

The Judge then and there charged the Jury that said evidence was not ruled out, and was before them; and that the legal effect thereof was not to defeat the recovery of the plaintiff, unless it proved property the subject of levy and sale under the *fi. fa.* against Alexander as assignee, and that a return of *nulla bona* on said *fi. fa.* was evidence of the insolvency of said bank, sufficient to give billholders their remedy against stockholders.

And that the mere fact that said Ragan received notes, &c.,

Thornton *vs.* Lane.

from said Lee, was not sufficient to prove the same the assets of said bank, but that to establish the fact that they were the property of said bank, it must be proved that they were held by the bank or had been derived from a previous assignee of the bank, as assets of the bank.

To all of which said charge and to each of them as severally and specifically given, and to said entire charge, the said defendant then and there excepted.

Upon these several exceptions error is assigned.

H. HOLT, TOOMBS, with whom were B. HILL and COLQUITT, for plaintiff in error.

LAW & BERRIEN, with whom was W. DOUGHERTY, for defendant in error.*

The following authorities were cited by H. HOLT, for plaintiff in error :

*Prince's Digest,* 124.   *Pam. Acts of* 1840, 27 *and* 8 ; 1841, 29 ; 1842, 29 ; 1843, 21.   *McDougald vs. Central Bank,* 3 *Kelly,* 185.   1 *Bla. Comm.* 484.   2 *Kent's Com. 3d edition,* 307.   *Angel & Ames on Cor.* 751.   *Mayor, &c. of Colchester vs. Seaber, Ex'r. &c.,* 3 *Burr,* 1866.   *King vs. Amery and Monk,* 2 *D. & E.* 515.   *King vs. Passmore,* 3 *D. & E.* 199.   3 *Kent's Comm.* 309.   2 *Story Eq. J.* sec. 1252.   *Mumma vs. the Pot Co.* 8 *Pet.* 281.   *Wood et al. vs. Dummer et al.* 3 *Mason,* 308.   *Vose vs. Grant,* 15 *Mass.* 505.   *Spear vs. Grant,* 16 *Mass.* 9.   *Curson vs. the African Co.* 1 *Vernon's Cases,* 121.   *Briggs et al. vs. Penniman et al.* 8 *Cowen,* 387.   2 *Kent's Com.* 307, *note* A. *Ib.* 312. *Slee vs. Bloom,* 5 *J. Ch. R.* 366.   *Ib.* 19 *J. R.* 456.   *Hasletts, Ex'r. vs. Witherspoon et al.* 2 *Rich. Eq. Rep.* 295. *Nevitt vs. the Bank of Port Gibson,* 6 *Sm. & M. Rep.* 513.

---

* The Reporter regrets that an Act of the Legislature debars him from inserting an abstract of the argument in this cause.

Thornton *vs.* Lane.

2 *Kent's Com.* 307.    *Com. Bank of Rodney vs. the State of Mississippi*, 4 *S. & M.* 440.    *Com. Bank Natchez vs. Chambers et al.* 8 *S. & M.* 9.    *Campbell et al. vs. the Mississippi Union Bank*, 6 *How. Miss. R.* 625.    *Bank of Miss. vs. Wren*, 3 *S. & M.* 791.    *Pres. &c. of Port Gibson vs. Moore*, 13 *S. & M.* 791.    *Lewis vs. Robertson, Ib.* 558. *King vs. Elliott*, 3 *S. & M.* 428.  · *Allen et al. vs. Mont. R. R. Company et al.* 11 *Ala. R. N. S.* 437.    *Paschall vs. Whitsitt, Ib.* 472.    *Bleakney et al. vs. Farmer's and Mechanic's Bank, Greencastle*, 17 *S. & R.* 64.    *Dr. Salmon vs. the Humborough Co.* 1 *Ch. Cases*, 204.    *Fox vs. Horah*, 1 *Ire. Eq. R.* 358.    *White vs. Campbell et al.* 5 *Hum. T. R.* 38.    3 *Bla. Com.* 429.    1 *Harrison's Ch.* 67.    1 *Story Eq. J. ch.* 1 *sec.* 8 *to* 21.    *Bank of Miss. vs. Wren*, 3 *S. & M.* 791.    *Lennox vs. Roberts*, 2 *Wheat.* 373.    *Jemison vs. Plan. Bank Mobile*, 17 *Ala. N. S.* 754.    *Saltmarsh vs. the same Bank.    Nathan vs. Whitlock*, 9 *Page*, 152.    *Talmage, Pres. vs. Pell and Wife.    In. re. the City Bank of Buffalo*, 10 *Page*, 378.    *Brace vs. Bishop*, 3 *Wend.* 13. · *Gullet vs. Fairchild*, 4 *Denio*, 80.    *In. re. Fenelon & McMartins, Pet.* 7, *Barr.* 173.    *Devans vs. Ding, Ch. T.* 10 *Barr.* 174.    *Seward vs. Graves et al.* 10 *M. & W.* 711. *Martin vs. Trustees Belmont Bank*, 13 *Ohio*, 250.    *Burnell vs. Bk. W. Union, Ib.* 298.    *Miami. Ex. Co. vs. Gaono et al. Ib.* 269.    *Hall et al. vs. Carey, assignee*, 5 *Ga. R.* 239.    *Carey vs. Green*, 7 *Ga. R.* 80.    *Young et al. vs. Harrison et al.* 6 *Ga. R.* 130.    *Brown vs. Chaney*, 1 *Kelly*, 412.    *Kenan & Rockwell vs. Miller*, 2 *Kelly*, 325. *Napier vs. Neal*, 3 *Kelly*, 301.    *Rodgers vs. Evans*, 8 *Ga. R.* 145.    *Wiley, Parish & Co. vs. Kelsey et al.* 9 *Ga. R.* 117.    *Preston vs. Clark*, 9 *Ga. Rep.* 244.    *Biggers, Mobley et al. vs. Mobley*, 9 *Ga. Rep.* 247.    *An. and A. on Cor.* 555.    *Marcy vs. Clark*, 17 *Mass.* 331.    1, 2 *and* 3, *Rev. St. N. Y.    Rev. St. Mass.* 31, '2, *et seq.    Rev. St. Maine*, 750.    *Clayton's Digest*, 270, 344.    *A. & A. on Cor.* 4.    *Lane vs. Morris*, 8 *Ga. Rep.* 468.    *McCluny vs.*

Thornton *vs.* Lane.

*Silliman,* 3 *Pet.* 270.    *Wynn vs. Lee,* 5 *Ga. R.* 217.    *Lane vs. Morris,* 10 *Ga. R.* 152.    *Clayton's Dig.* 270, 344. *Prince's Dig.* 375, '7.    *Young et al. vs. Harrison et al.* 6 *Ga. R.* 156.    *Bailey & Storm vs. Bancker,* 3 *Hill's N. Y. R.* 188.    *Moss vs. McCullough,* 5 *Ibid,* 131.    *Jones vs. Pope,* 1 *Saun.* 37.    *Watson on Sheriff,* 143.    *Rex vs. Vice, Ch. Cam.* 3 *Burr.* 1661.    *Rex vs. Dr. Askew,* 4 *Burr.* 2200. *Ellis vs. Marshall,* 2 *Mass.* 279.    *Fletcher vs. Peck,* 6 *Cranch,* 9.    *Wat. Dig.* 559, '60.    *Hightower vs. Thornton,* 8 *Ga. R.* 492.    1 *Blac. Com.* '29, '30.    *Prince's Dig.* 462.    *Thompson vs. Central Bank,* 9 *Ga. R.* 415.    *Collins vs. Blantern,* 2 *Wilson's R.* 348.    *Adopting Act, Cobb's Dig.* 721.    *Bacon Ab. title Stat.    Hale's Hist. Com. Law,* 68.    *Walker vs. Scudder,* 1 *Kelly,* 132.    *South Sea Company vs. Wymondsell,* 3 *Peere Wms.* 143.    *Murray vs. E. In. Co.* 5 *Barn. & Ald.* 204.    *Bullard vs. Bell,* 1 *Mason,* 243.    *Dartmouth College vs. Woodward,* 4 *Wheat.* 518. *Charles Riv. Br. vs. Warren Br.* 11 *Pet.* 420.    *Mar. & Cr. Dig.* 33.    *Angel on Lim. Ap.* 5.    *Johnson et al. vs. Lancaster,* 5 *Ga. R.* 47.    *Dickinson vs. McCamy,* 5 *Ga. R.* 488.    2 *Bla. Com.* 465.    *Tomlin Law Dic. title Specialty. Bouviere,* 2 *S. & R.* 503.    1 *Burr.* 261.    *Wills,* 189.    1 *Peere Wms.* 130.    *Br. B'k Ala. vs. Kirkpatrick,* 5 *Ga. R.* 36.    4 *Burr.* 1963.    1 *D. & E.* 291.    *Lawler et al. vs. Walker et al.* 18 *Ohio R.* 151.    *Corning & Horner vs. McCullough,* 1 *Com.* 47.    *Jackson vs. Sackett,* 7 *Wendell,* 94. *Clarke vs. Figes,* 2 *Starkie,* 234.    *Martin vs. Broach,* 9 *Ga. R.* 21.    *Bird vs. Adams,* 7 *Ga. R.* 505.    *Smith vs. Lewis,* 9 *Ga. R.* 418.    1 *Kent's Com.* 468.    1 *Leigh's Nisi Prius,* 8.    *Thalimer vs. Brinkerhoof,* 20 *J. R.* 397.    *Bank U. S. vs. Owens,* 2 *Pet.* 27.    *Lumpkin et al. vs. Jones,* 1 *Kelly,* 27.    *Bond vs. Appleton,* 8 *Mass.* 472.    *Curtis vs. Harlow,* 12 *Met.* 3.    *Middleton Bank vs. Magil,* 5 *Conn.* 28.    *Moss vs. Oakley,* 2 *Hill's N. Y. R.* 265.    *McCullough vs. Moss,* 5 *Hill's N. Y. R.* 569.    *Adderly vs. Storm,* 6 *Ibid,* 624.    *Worrall vs. Judson,* 5 *Barbour S. C. R.* 210.

*Gray vs. Portland Bank,* 3 *Mass.* 379.    *A. & A. on Cor.* 500.    *Ward vs. Griswoldville Manufacturing Co.* 16 *Conn.* 593.    *Minor et al. vs. Mech. Bk. Alex.*    1 *Pet.* 46.    *Geo. Railroad vs. Harris,* 5 *Ga. R.* 527.    *Towns, Governor, &c. ·use, &c. vs. Springer,* 9 *Ga. R.* 130.    *Mobley et al. vs. Mobley, Adm. Ibid,* 247.    1 *Salkeld,* 196.    *Civitas London vs. Wood,* 12 *Mod. R.* 669.    *Taylor vs. Smith,* 4 *Ga. R.* 133. *Echols and Wife vs. Barrett,* 6 *Ga. R.* 443.    *Dougherty vs. Bethune,* 7 *Ibid,* 90.    *Salem Mill dam Cor. vs. Ropes,* 9 *Pick.* 187. *Jenkins vs. Union T. Co.* 1 *Caine's Cases in Error,* 86.    *Goshen T. Co. vs. Hunter,* 9 *J. R.* 218.    *Highland T. Co. vs. McKean,* 11 *J. R.* 98.    *Hibernian T. R. vs. Henderson,* 8 *S. & R.* 219.    *Monroe vs. The State,* 5 *Ga. R.* 86.

*By the Court.*—LUMPKIN, J. delivering the opinion.

After the time spent in the re-argument of this cause, the complaint will not be reiterated, I trust, that the questions .involved have been decided with " *constitutional haste,*" whatever other objections may be urged against the judgment.

We have listened *patiently* at least, if not with unmixed pleasure, to eight elaborate arguments, occupying more than as many days, on questions, some of which have never been disputed, and most of them heretofore solemnly adjudicated by this Court.

[1.]    As to the right of a party to re-assign upon another writ of error in the same case, points which have already been determined, we wish the position of this Court to be distinctly understood ; and this is rendered the more necessary, from the fact, that its own authority is invoked for the new feature, now for the first time to be engrafted in our judicial system.    Let it not be supposed for a moment, that parties are entitled to this privilege as matter of *right;* and that if it be conceded in any case, it is of *favor only.*

In the writ of error before us, we have not deemed it advisa-

ble to arrest the discussion, for the reason, that when these bank cases came up two years ago, we had not a full Court; and they were new in practice, if not in principle, in this State.   Hence, we were willing to submit to a re-argument of them.   We need not say, however, that when questions have been   once decided by this Court, they are to be considered as the law of the land, and respected and   carried into full effect as   such, the   same   as a Statute' of the State ; and that we  will not in future, entertain a writ of error at  the instance of the   same   party,   except   by leave, involving points which have been already distinctly settled. And this license will be grudgingly granted, appreciating, as we do, the importance of having  it understood, that the law is *stable*.   It is only in *extreme cases* that a  Court in  the  last  resort should permit its judgments to be drawn into controversy.   The doctrine of *stare-decisis*, is right, both  upon policy  and  principle.

Say the Constitutional Court of  South Carolina,  in  the *State vs. Deleisseline*, (1   *McCord*, 52,) " the  importance of  adhering to decisions of this Court, is becoming  more and more manifest every day.   A greater evil  can scarcely attend a  Court in  the last resort, than that its  decisions should be unstable and fluctuating.   The very object of such a Court is to give  certainty to what before was uncertain.   Its decisions become a rule of  property  and a rule of conduct," (and  I would add,  of *legislation* too, as the  several bank charters  recently  granted in this State will show,)  " and ought to receive such support as to secure to them, the unbroken confidence of  the community."   The learned Judge who delivered this opinion, added, "that such was the respect  entertained by  the Bench of that State, for  their own decisions, that after ten years' experience, he knew but *one case* where the Court had undertaken to review and reverse a former decision."   And we will not be understood, of  course, as denying to  parties who have never  been before the Court, the privilege of  prosecuting a writ of  error for  the purpose of  reversing *any* decision,  sentence,  judgment or   decree,  of  any  Superior Court of  this State.

Much sympathy has been expressed for  the Court  during this

discussion, (a fashion not unfrequent *at this bar,*) for the " constitutional haste" with which it is compelled to decide cases. *Personally,* its members are entitled to this sympathy ; for our peculiar organization imposes upon us, an amount of labor, bodily and mental, without a parallel in any other appellate tribunal in the world. But if it be designed by this to weaken the force of the decisions themselves, *as law,* then however kindly intended, we must respectfully decline the apology thus *volunteered* in our behalf.

Both observation and experience teach, that the human mind acts with increased power according to the pressure put upon it. Give it time and it acts slowly. Force it to decide promptly, as the General is required to do on the battle-field, and the statesman in the midst of revolutions, and the same mind will do the work of a month in a moment ; and what is more, will do it better. True, the effect upon the individual himself, is most exhausting, but the public does not suffer.

Let cases then be properly prepared and argued—and none should be brought up that are not—and concentrating as we are compelled to do, all of our intellectual and physical energies, in the brief space of time allotted for the purpose, the determinations are made, and in my humble judgment, neither the parties nor the public have just cause of complaint, that more space was not allowed for consultation.

It is reward enough for all our toils and sacrifices, the extent of which are known only to ourselves, that the administration of each of the present incumbents, such as it is, has received the almost unanimous approval of a generous profession and a just people. With this verdict we are satisfied ; and proudly plead it in bar of all that is said or *insinuated,* openly or covertly, to our prejudice.

[2.] Why so much time and talent, labor and learning, have been employed to establish a proposition which nobody denies, viz : that the debts of a corporation, either to or from it, are extinguished by its dissolution, I am at a loss to comprehend. Certain it is, that it was recognized by this Court at this place

Thornton *vs.* Lane.

two years ago, as it had been on more than one occasion previously.

In *Hightower vs. Thornton and others*, (8 *Ga. R.* 486,) this Court say, "upon the threshold of this argument, we are met with the Common Law principle, that upon the dissolution of a corporation, all the debts due to and from it, are extinguished. A doctrine which results necessarily from the fact, that the corporation having expired, whether by its own limitation, by surrender, abandonment of its members, or judgment of dissolution, there is no one in law to sue or be sued."

That this doctrine is "*odious*," is evidenced by the fact, that a majority of the American States have already by their "enlightened legislation" "interposed to prevent, to ward off, the iniquitous consequences" of this Common Law rule; the existence of which, I take it upon myself to affirm, is "a disgrace to a civilized State." Georgia is not obnoxious to this reproach, so far as this corporation and others in its vicinity, *in pari delicto*, are concerned. She has made ample provision to rescue *them* from the operation of this rule. Such being the rule however, and the foundation of it, this Court does not feel itself called on to extend it one jot or tittle, beyond the reason which gave it birth.

It is asserted with great confidence, that "the legislation of no country could present a bloodier legal picture." "The annals of jurisprudence do not afford a parallel to such an assumption," as the liability of the stockholder to the bill-holder, which is here sought to be enforced. But strip this picture of the boldness of its outline, its gaudy coloring, and what are the naked facts, as they stand revealed upon this record?

A bank charter is created with a capital stock of a million of dollars, two hundred and fifty thousand of which are required to be paid *in specie*, before any bills are issued.

[3.] By the 14th section of the charter, it is enacted, that for the well ordering of the affairs of said corporation, there shall be seven directors, who shall be elected as soon as the sum of two hundred and fifty thousand dollars *in specie*, shall have been paid in by the stockholders of the bank; and the President,

Thornton *vs.* Lane.

directors and cashier are hereby *expressly inhibited* from the issu-
ing of their bank notes, until they have officially and under oath,
notified to the Governor that the provisions of the charter, in
this respect, have been *literally and strictly* complied with.   *Prin.*
125, 126.

By one of the fundamental articles of this corporation, it is
provided, that the total amount of debts which the company
shall at any time owe, whether by bond, bill, note, or other se-
curity, shall not exceed three times the amount of their capital
stock actually paid in, over and above the amount of specie ac-
tually deposited in the vaults for safe keeping; that in case of
excess, the directors under whose administration it shall happen,
shall be liable for the same *in their private and individual capaci-
ty,* and may be sued for the same in any Court of Record in the
United States, *by any creditor of the corporation,* any condition,
averment or agreement to the contrary notwithstanding; but
that *this* " superadded security " shall not be so construed as
to exempt the said corporation, or the lands, tenements, goods
and chattels, of the same, from being held liable for, and chargea-
ble with said excess.

And by another clause it is enacted, that the *persons and pro-
perty of the stockholders* shall be pledged and held bound in
proportion to the amount of shares and the value thereof, that
each individual or company may hold in said bank, for the *ulti-
mate* redemption of the bills or notes issued by said bank, in the
same manner as in common actions of debt; and no stockhold-
er shall be released from such liability by sale of his stock, un-
til he shall have caused to have been given sixty days' notice
thereof, in some public gazette of this State.   And in case
of a failure of said bank, all the stockholders who may have
sold their stock at any time within six months prior to said fail-
ure, shall be liable in the same manner as if they had not sold
their stock.   *Prince,* 125, 127.

This then, is the contract made by this corporation with the
public, and these are some of the obligations and responsibili-
ties which the *corporators* assumed; the defendant, in com-
mon with all the other stockholders, by his acceptance of the

charter, agreeing to all its terms, and to that individual liability clause amongst the rest, for the *ultimate redemption* of the bills of the bank. Every stockholder understood that he took upon himself this risk and burden, and pledged his person and property for the fulfilment of this duty. And on the other hand, every bill-holder, it must be presumed, took the notes of the bank upon the faith of that security for the performance of the undertaking. The contract was inchoate, but the liability commenced when the bills were first put into circulation. It was consummated when the corporation finally failed to redeem them. When the bills of the corporation were issued and received, the holder acquired a right against the stockholder, of which, although *ultimate,* nothing could deprive him. It was absolute, vested, and fixed, notwithstanding its enforcement was deferred or postponed until the happening of a future contingency.

Let us turn now to the testimony of Abram B. Ragan, to see whether the Courts should be astute to protect the stockholders of this company from liability; or whether they should not be liberal in providing the bill-holders with the means of preventing their escape, in the application of those remedies so wisely guaranteed by the Legislature.

Mr. Ragan was cashier of the Planters' and Mechanics' Bank of Columbus, at its first organization, late in the preceding winter, or early in the spring of the year 1837, and continued in office till the spring of 1838. He testifies, that when the bank was organized all its stock was subscribed for, and that 25 per cent. thereon was paid; that a large portion of said payment was made in the specie certificates of deposite, given by the Bank of Columbus and the Insurance Bank of Columbus; that a committee of stockholders made arrangements with those banks to give specie certificates for the notes and bills of the stockholders in the Planters' and Mechanics' Bank; that said bank did no business in 1837; and after its organization resolved to do none until the fall of that year, *and a resolution was passed to discount the notes of its stockholders to the amount of their stock, less about 2 per cent. for contingent expenses, respect-*

*ively, making said notes due 1st October,* 1837 ; and that if said stockholders did not borrow upon these terms, others might, *and this arrangement was carried out mainly, if not entirely to stockholders ;* that the first bills issued by said bank, were dated 6th February, 1838, and commenced to be put into circulation a week or ten days thereafter; and then banking business commenced. When this banking business was determined on and commenced, the stockholders and others who had given notes, as before testified to, were required to pay in 50 per cent. thereon, which payment was made in *bank bills of suspended banks, and not in specie.* At the time bills were first issued by said bank, it had but little specie on hand or in its vault; *not exceeding* $800 or $1000. Said bank made three issues of bills in 1838, the first of $50,000, the second of $150,000, and the third of $80 or 100,000. *It commenced business as a suspended bank, and paid no specie whilst witness was connected with it as cashier, except small amounts for change.*

These are the startling facts disclosed by the officer who best understood the condition of this institution, and who testifies to what he knows. And yet, when these stockholders who thus abstracted from the vaults of the bank, its specie funds, which they subsequently returned *" in bills of suspended banks,"* are called on to make good their collateral promise and undertaking under the charter, for the *ultimate* redemption of a portion of the $300,000 of redeemable paper currency so illegally and unwarrantably cast upon the community, the attempt is made to browbeat and over-awe not only the parties, but even the Courts of the country, for meting out to the bill-holders, the simple measure of redress so providently provided by legislative forecast ; and the most impassioned declamation is resorted to, to expose the *" anomaly "* of such a procedure. To our minds, it would be a much greater *" anomaly "* to suffer a corporation to contract liabilities contrary to its charter, and which it was either unable or unwilling to discharge, and which are adjudged sufficient to work a forfeiture of its charter, and then for the corporation to be relieved from their *personal* liability, by thus taking advantage of their own wrong.

The very idea is abhorrent to every principle of justice. And the Legislature wisely intended, no doubt, to remove from the corporators this strong temptation, to make a way of escape from the consequences of their own defalcation, by surrendering their charter, or doing, or omitting to do those things, which would incur a forfeiture.

And why should it be thought a strange thing for the corporation itself, which is *primarily* liable, to be exonerated under the operation of the Common Law rule, to which we have adverted, and for the *personal* liability of the stockholder, which is *secondary* only, to be retained and enforced? It would not be pretended that a debt due by the bank, and upon which there was an *indorser*, could not be enforced against the latter, notwithstanding the discharge of the principal. Nor is this any new principle, either in legislation or jurisprudence. It has occurred a thousand times and oftener, no doubt, under the bankrupt Acts of England and of this country, that the principal debtor has been released by law, while the debt has been enforced against other parties to the paper, who were in no way interested in its consideration, which cannot be said, by the by, of these corpo-. rators. They are no *accommodation* parties merely, but joint and several stockholders, interested in the circulation of the bank, together with all its other operations, upon which a profit or loss might accrue. They would have participated in the *profits* had any been made; where is the hardship then, of compelling them to share the *loss?* For myself, I can see none. We are content, therefore, after the most mature reflection, to re-affirm merely on this point, the views which we expressed when it was first presented for our consideration, in *Lane vs. Morris.* That "in the opinion of this Court, the right of the bill-holder under the 11th section of the charter, to hold the person and property of the stockholders pledged and bound for the ultimate redemption of the bills and notes of the bank, in proportion to the amount of his shares and the value thereof—a right which is not *primary and total*, but *secondary and partial*—is one which he may assert in his own name, *before* and *after* the *final* dissolution of the corporation; one which is wholly above

and beyond the reach of any legislation, and independent, and irrespective of it;" that it "is a supplemental or superadded security, for the benefit of the bill-holder, one which he is authorized to enforce in his own name in an action of debt at Law, directly against the stockholder." 8 *Ga. R.* 468.

2d. But it is contended that the plaintiff's right, if he ever had any, is barred by the Statute of Limitations, of either four or six years. It is sufficient to state, that in point of fact, it is barred by neither, according to this record. The return of *nulla bona* on the execution against the assignee of the bank, was made the 17th of March, 1848, and this action was brought the 19th of January, 1849, within less than one year from the time when the liability accrued. And strange as it may seem, a similar state of facts existed in the case of *Lane vs. Morris*, decided at this place twelve months ago. There judgment was confessed in 1848, a return of *nulla bona* made on the *fi. fa.* in March of the same year, and the suit was brought to May Term, 1851, of the Superior Court of Muscogee County, viz: within about three years of the time when the right accrued. Indeed, 'if the *equitable* assets of the bank are to be first exhausted, before the eventual personal liability of the stockholder can happen, as is insisted upon by the plaintiff in error, the Statute has not yet commenced running.

The plea of the Statute of Limitations, as applicable to this class of claims, was first made in *Lane vs. Morris*, to which I have already referred. It appeared from the record, that this defence, among others, had been filed in the Court below; and it was argued before this Court, and an opinion pretty strongly expressed against the Statute. When I came to write out the opinion, however, I was convinced, by a careful examination of the bill of exceptions and transcript, that the question was not legitimately made—for the reason, that although the fact had been assumed in the argument, that still it did not appear from the record that the point had been decided by the Circuit Court. In truth, I apprehend that it was, and in favor of the plaintiff in error; and hence it was not excepted to and brought up. The Court therefore threw out the intimation merely, that "it ap-

peared to have been long since settled in the English Courts, that the limitation of six years did not extend to the case of an action of debt founded upon a statutory liability—the Statute being considered in the nature of a specialty; and that, in *Bullard vs. Bell*, (1 *Mum.* 243,) Judge *Story* reviewed the authorities upon this subject, and decided, that the short bar ot six years did not extend to an action of debt against the stockholders of a corporation, founded upon a statutory liability."

· In the same case, the question was regularly presented twelve months thereafter, and the *intimation* previously thrown out was fully adopted, namely, that in an action brought by a bill-holder against a stockholder, under the 11th section of the charter incorporating the Planters' and Mechanics' Bank of Columbus, for the ultimate redemption of the bills issued by the bank, the liability will be considered in the nature of a specialty, and *not* barred until twenty years have elapsed. 10 *Ga. Rep.* 162.

To this *judgment* we still *adhere*, with unshaken confidence in its soundness.

. *The Bank of the United States vs. Dallam and others*, (4 *Dana*, 574,) decided by the Court of Appeals of Kentucky, was not relied on in the discussion in the case in 10 *Ga. Rep.* nor was it before the Judge who delivered the opinion in that case. It is very similar in many respects, to the case now under consideration, as well as to that of *Lane and Morris;* and we are gratified to find the coincidence in the conclusion of that Court and ourselves, as well as in the train of reasoning by which they were guided, and the authorities upon which they relied to sustain their opinion. It is a consolation and encouragement in questions of such magnitude, to be thus sustained and fortified. ·

The Bank of the United States having in November, 1820, obtained a judgment for seven thousand dollars, with legal interest from February, 1820, against a private corporation, styled the "Fayette Paper Manufacturing Company," and having had a *fieri facias* issued thereon, on which there was, early in 1821, a return of *nulla bona*, filed a bill in Chancery against the stockholders of the company, in 1830, for subjecting their individu-

al property in proportion to the respective amounts of their se-
veral interests, in virtue of a provision in the charter of incor-
poration, in the following words : " Provided, however, that the
estate and property of any individual shareholder, who holds or
possesses stock in said corporation, shall at all times be liable
and subject in law, in proportion to his or her interest therein,
to pay and satisfy all debts and demands contracted by said
corporation, during the time he or they held stock therein, upon
the failure of the incorporate funds to discharge the same."
The several defendants having in their answers relied on the
Statute of Limitations, the Circuit Judge, on that ground, dis-
missed the bill absolutely, and the bank appealed and insisted
on a reversal of that decree.

Chief Justice *Robertson,* who delivered the opinion of the
Court, says :

" As the judgment and return on the execution thereon, enti-
tled the bank to demand the amount of its debt from the stock-
holders in their personal right; and as they are liable, not *in
solido,* but only distributively, in the ratio of their several inter-
ests, and are moreover multitudinous, we have no doubt that
the Circuit Court sitting in Equity, had jurisdiction over a joint
bill as filed against all of them, concurrently, with the cognizance
of a Court of Law over separate actions against each of them
upon his sole and several liability."

The Chief Justice then proceeds to show that any limitation that
would bar the action at law, would bar the bill; and that the provis-
ion in the charter subjecting the property of the stockholders, does
not render their property liable to the levy of an execution on a
judgment or decree against the corporation, nor subject them to
any suit as parties directly bound by any contract of the corpo-
ration; but that the liability of the shareholders is founded upon
the contract made by the corporation, the return of *nulla bona*
showing the failure of the corporation to discharge it, and *the*
*Act of Incorporation,* all of which constituted a *statutory liability*
which might be properly enforced at Law by an action of debt,
and thus continues—

" Counsel for the shareholders, assuming that their liability is

collateral, and results only from an implied promise, insists that *assumpsit* would have been the appropriate remedy.   But we can neither admit this assumption, nor acknowledge the conclusiveness of the deduction thus drawn from it.

"The Statute of Limitations of this State, like that of James the First, of England, provides among other things, that all actions of debt grounded upon any *lending without contract* or *specialty*, shall be brought within five years after the cause of such action or suit, and not after.   In England as well as in this country, it has been frequently decided, that the foregoing *provision* respecting the action of debt, applies only to such actions on *parol* contracts; and also that it applies to such contracts only as are contracts *in fact*, and not to such obligations *quasi ex contractu*, as are imposed either expressly or constructively by *mere law*."

And in support of the foregoing positions, the following cases are cited: *Jones vs. Pope*, 1 *Saunders*, 367, '8, *and notes; Hodsden vs. Harridge*, 2 *Ib.* 64, '5, *and notes, and cases there cited; Peese vs. Howard*, 14 *Johns. Rep.* 479; *and Bullard vs. Bell*, 1 *Mason*, 243.

[4.] It is contended that this case is entitled to no weight as *authority*, for the reason that the question which it purports to adjudicate, was not legitimately presented for the determination of the Court.   The same criticism is made on the remark of Judge *Story*, in *Wood et al. vs. Dunner et al.* 3 *Mason*, 308; viz: that the capital stock of an incorporated bank is deemed a trust fund for the payment of debts, &c.   Indeed I may add that the opinion in almost every case which has been relied on in support of these bank decisions, has been disposed of in the same summary manner.

What *adjudications*, I ask, are *authority* in this State?   None, I answer emphatically, except the decisions of our own Courts; of the Supreme Court of the United States, upon subjects on which they are made by the Constitution the exclusive or final arbiter, and those of the English Courts previous to our adopting Statute.   All else is *mere opinion*, and comes recommended in reference alone to the source from which it emanates.   With this limitation, the inquirer after judicial truth is at liberty to

Thornton *vs.* Lane.

range through the whole field of legal learning ; to explore the decisions of the American Courts—British and other foreign tribunals—the opinions of majority or minority Judges—of distinguished jurists, on or off the Bench—on points made or not made by the pleadings, text-books, elementary treatises, law lectures, and every other department of judicial science ; gathering resources from all ; examining the whole without fear ; retaining what is applicable to truth and justice, and rejecting what is not.

When a decision has been pronounced in England or the Courts of this country, upon solemn argument upon the exact point in issue, it is deserving of course of more respect. The presumption is in favor of its correctness ; and we adopt it frequently and the more readily as a just exposition of the law. Still, I repeat, it is not *authority;* and it is a total misconception of the matter to claim for it the sanctity of law, and to maintain that the Courts are bound to follow it as such. It is *mere opinion,* and nothing more.

In cases which are *authority,* we must look alone to the *principle* of the decision ; for that alone is *law.* And any expression of opinion by the Judge in such cases is *obiter dictum* only. But where the whole is but opinion and nothing more, it is not improper to look to the argument of the Bench or the individual member of the Court, who is its organ in delivering its opinions.

In *Slack vs. Moss, Dudley,* 161, the Convention of Judges, in determining between the conflicting rules in *Walton and Shelly and Jordan and Lashbrooke,* followed the dissenting opinion of Judge *Cheves,* in *Craig vs. Newton,* in preference to that of a majority of the constitutional Court of South Carolina. They adopted the opinion of *Lord Kenyon* instead of that of *Lord Mansfield,* because the latter decided in reference to the commercial policy of England, to the injury of every other interest. They rejected the lead of New York, Pennsylvania and Massachusetts, because as they supposed, the Judges of those States, taken as they generally were, from the large commercial cities of those States respectively, adhered to the rule in *Walton* and

*Shelly*, for the same reason that it subserved the local interests of New York, Philadelphia and Boston.

In other words, the Convention denied as *authority*, the decisions of the State Courts as well as the British Courts, since the revolution, because their reasons were not sound and applicable to the state of things here; but " encouraged a spirit of favoritism at war with the genius of our Constitution, and adverse to the tranquillity of our government."

Equally untrammelled is this and every other independent Court in this country. Apart from *authority*, we look to *principle* alone, as the beacon-light to guide our investigations.

We here dismiss this ground, with the single remark, that we are clear that a *statutory liability* is not included within any of the Acts of Limitation of this State. It is neither a simple contract; nor a *specialty* for nothing is but a writing under seal; but a *quasi* contract in the nature of a specialty. But being at least as high evidence of indebtedness as any specialty can be, that twenty years is the proper bar to actions brought to enforce the obligation it imposes. Notwithstanding some fifty pages of Mr. Holt's brief are devoted to the discussion of this branch of the case, it signally fails in controverting this impregnable position. It is the capital defect in this voluminous argument.

Even if this statutory liability was a specialty, and consequently embraced in the Statutes of 1767 and 1805, *as it is not*, still we should hold that the limitation of *four years*, provided by the latter Act, did not apply to this case. By the Act of 1767, *specialties* are excepted from the *four* years limitation therein imposed; or rather the four years bar is expressly restricted to *contracts without specialty*; by the Act of 1805, the four years limitation is extended to *all contracts*. But by the Act of the 8th of December, 1806, the law of 1767, is fully revived; and all Acts and parts of Acts which militate against its intent and meaning are repealed. When the Statute of 1767, had restricted the limitation of four years to contracts *without* specialty, and the Act of 1805 extended it to contracts *with* specialty, may it not be fairly insisted that this latter provision is contrary to the true *intent* of the former, and therefore repealed by its revival?

But I repeat that we do not rest the decision upon this view of the subject.

3d. The next position occupied by the plaintiff in error, is that not being an original subscriber for the stock upon which he is sought to be made chargeable, but holding by transfer from others who failed to give the sixty days notice of the sale in terms of the charter; and the same, moreover, having been made within six months before the failure of the bank, the liability, if there be any, is upon the original stockholders, and not upon him; that the assignment itself is void as to the creditor. Besides, he insists that if liable at all, it is not to the extent claimed by the plaintiff in his action, inasmuch as that would make the capital stock of the bank *four*, instead of *one* million of dollars, as limited by the charter.

One of the counsel for the plaintiff in error, cites numerous precedents from the different States of the Union, to show that upon charter clauses similar to the one under consideration, it has never been held that *all* who ever were stockholders are liable. That I may do justice to this portion of the argument, I will transcribe the whole of it.

"We grant that the cases to which we have referred, look a different way, *every way*, except as we have said, to the liability of all. We believe that if the Courts making those decisions, had entertained the just and holy horror which we have endeavored to express, and which this Court has on a former occasion so well expressed, of judicial legislation, they would not have made these decisions.

"Courts are too prone to feel that they are called upon—that they are obliged, to help out the errors of legislation. This confessedly is not their duty, nor is it their privilege.

"We believe that it was this conviction, well fastened upon the mind of the Court, that it could not, that it did not possess the administrative power so extensive as to single out a particular class and declare them liable, that led it, may we in the most perfect respect say, hastily to the conclusion, that all were liable. If it was haste, it was *constitutional haste*, the misfortune, the great misfortune of this tribunal, and in nothing its fault.

We of course allude to that particular provision of the Constitution, which compels, with a tyrant's will, the decision of every cause brought to a term and during the term, be the causes many or few, and the term short or long. We have seen the mass of confusion and contradiction multiplied into itself, which has grown out of the efforts of the Courts to help out the omissions of the Legislature. Here we have seen that one class was decided liable, and there another; and yet under the very same law or laws, having in view the same ends. The charter of the Rossie Lead Mining Company, upon the construction of which, in this particular connexion, we have referred to a number of cases, had its origin in 1837. In 1846, we find in the Court of Errors of New York, senators gravely discussing *who* were *liable*, and continuously from the date of the charter this has been so; the Courts agreeing upon nothing, save that which we seek to establish—that all are not, and cannot be liable. This very confusion and contradiction—this very inability of the judicial mind to centre upon any particular class, is in itself a most potent and unanswerable argument in favor of our position: that it is a matter which could alone have been settled by the law-making power; and this having omitted it, the law-administering power cannot cure the omission.

"We have done with this question. Have we shown that there is no precedent for the liability of all, and that the Legislature having failed to designate a class, the Court is powerless to supply the omission? This is what we have intended; our success is not for our judgment."—*Mr. Holt's Brief, page* 96.

*Ex concesso*, then, every Court that ever decided this vexed question, has ruled it wrong, "ourselves included." All the rest, in fixing the liability upon *any* particular class of stockholders; we, for holding that *all* are responsible. With this difference however, (thanks to our brother for this plea in mitigation in our behalf) that other Courts had ample time "to see the right and pursue it too," while we have been betrayed into error by the "constitutional haste" with which we are compelled to render our judgments.

After *nine years!* consideration, it seems that the New York

Thornton *vs.* Lane.

tribunals have been unable to agree upon the proper construction to be put upon a similar clause in the charter of the Rossie Lead Mining Company. It may be expected that their solution of this knotty point, *should they ever arrive at one,* will at least be satisfactory.

We shall endeavor to avoid the imputation of adding to " the mass of confusion and contradiction multiplied into itself" which has grown out of conflicting decisions, by being at any rate consistent with ourselves ; and maintaining, as we have heretofore done, that inasmuch as the charter declares, that " *the stockholders shall be bound*" for the ultimate redemption of the bills of the bank, that it is our duty, first to ascertain who answers the description, and then against such to enforce the obligation imposed by the Act.

Another distinguished counsel for the plaintiff in error, whose candor never forsakes him, be the consequences what they may to his client or his cause, admits, as all fair minds are forced to do, *that somebody is liable* for the ultimate redemption of the circulation of this bank; and he inclines to the opinion, that it is those who were stockholders at the time the liability accrued. And in his argument before the Court he was understood to say, those who were stockholders when the bills were issued, and who, notwithstanding the transfer of their stock, · had failed to get released upon the conditions prescribed by the Act.

In business corporations, as mining and manufacturing companies, this rule has frequently been adopted, and may be just and right. In banking institutions, it is wholly impracticable. The date of a contract fixes, ordinarily, the time of its execution, and consequently, the period when the liability of the parties to it attaches. Not so with bank bills. The date of a bank note is no criterion whatever, of the time when it originally issued, much less of its last or final issue ; for the bills of · a bank are returned and re-issued daily, in the ordinary course of business.

Besides, this construction would often result like the other, in discharging all the stockholders. For example, suppose that those who were stockholders in 1838, when the first $300,000

were issued by this bank, had all transferred their stock more than six months previous to the failure of the bank, and had given the sixty days' notice thereof in terms of the charter. They would be exempt, of course, by the law of their contract. Neither could their assignors be made responsible, for they were not stockholders when the notes were issued. In such case, upon this hypothesis, none would be liable. But here, again, we encounter the stern mandate of the Statute, that "*the stockholders shall be liable* for the ultimate redemption of the bills of the bank."

We have been furnished with numerous rules of construction, by which it is insisted, the true exposition of this 11th section must be guided. And amongst the rest, it is said, that the term *stockholder*, must receive the same interpretation wherever it occurs in the charter. By the 4th section of the charter, it is provided, that the *directors* shall be chosen by the *stockholders*, on the first day of February of each year. And it is asked, will it be pretended that those who have transferred their stock, but failed to give the sixty days' notice, would nevertheless be deemed *stockholders*, in contemplation of this 4th section; and as such, be allowed to vote for directors? Most certainly not. And we now retort the inquiry, and with an application which it is difficult to escape; are not they *stockholders*, and as such, entitled to vote, to whom the transfer is made, with or *without* notice?

If the argument, therefore, is good for anything, it will fix conclusively the ultimate liability, under the 11th section, upon the *assignees* of the stock, whether the *assignors* have complied with the Statute in making the transfer, or not.

But candor compels us to say, that in our judgment, the fallacy of the proposition consists in the assumption, that the same meaning is to be attached to the term stockholder, wherever it occurs in the Act. The true distinction is this, the unlocking of which, has created much confusion in this argument. The same individuals may be stockholders outside, but not inside, the corporation. As it regards *third persons* and the liability clause in the 11th section, all are stockholders, *pro hac vice*, who ever

were such, and who have failed to get released in the manner prescribed by the charter. But as between one another, those only are stockholders who actually for the time being, own the stock, by subscription or purchase. One idea alone, will demonstrate the truth of this proposition. A sale of stock within six months of the failure of the bank, *with notice*, does not discharge the seller from the liability clause in the 11th section, as a *stockholder*. And yet, will it be pretended that the seller is a *stockholder*, and would be so treated and considered by his co-corporators, so far as the rights and privileges of the members of the corporation are concerned?

Counsel have fallen into another error, equally palpable. Mr. Colquitt argues, that the ultimate liability of the stockholder, could only be enforced during the continuance of the charter, on the ground that it is a solecism in language, to speak of a *stockholder* in a corporation which is dissolved. And yet, in New York, where the individual liability does not accrue until after dissolution, the same phraseology is everywhere used by the Courts, in their opinions upon these cases. Take as an illustration, the first head-note in the *Bank of Poughkeepsie vs. Ibbotson*, (24 *Wendell*, 473,) " An action at law lies against an individual *stockholder* of a corporation for debts owing by the company at the time of its dissolution, &c." See also, *Slee vs. Bloom*, and *Perryman vs. Briggs*, 1 *Hopk. R.* 300, 8 *Conn.* 387. *S. C. in error*. And this is the expression almost universally employed in the charters of moneyed and other corporations, which contain an individual liability clause. *Angell & Ames on Corporations*, 552, 553.

We must say, with sincere respect for the eminent counsel who pressed this position with so much warmth, that it is in our judgment, more a play upon words, than anything else. The Legislature intended by the use of the term *stockholder*, to indicate the persons composing the company, upon whom this individual responsibility should attach, whether before or after the dissolution of the charter. " The *stockholders*," say the authors just cited, in every bank, *at the expiration of its charter*, are chargeable in Massachusetts in their individual capacities, for the pay-

ment of all bills of the bank remaining unpaid, in proportion to their stock." *Ibid*, 552. We must say, moreover, that we are far from yielding to the reasoning in this case, which would exempt the stockholders unless prosecuted during the existence of the charter. The 16th section looks decidedly the other way. In many of the States, the fact of *dissolution* is made the contingency upon which the individual responsibility attaches ; and there is good sense in this view of the subject.

We settle down, therefore, not only with undiminished, but increased conviction in the truthfulness and rectitude of our former opinion, namely : that inasmuch as the charter does not restrict the liability, as is usually done, to any particular class of stockholders, either those who originally subscribed, those who were stockholders when the bills or notes were issued, or those who were so at the time of dissolution or when the liability is sought to be enforced; making provision, however, for all to escape liability who have transferred their stock and given sixty days' notice thereof, in some public gazette of this State, provided the sale has not taken place within six months prior to the failure of the bank ; and declares most explicitly that no stockholder shall be relieved from his liability, notwithstanding any disposition he may have made of his stock, until this is done ; that all who ever were stockholders are liable to bill-holders, unless they have been discharged in the manner prescribed by the Act.

Such is the plain, express and unmistakable language and meaning of the Statute. And so ample was the security which the Legislature intended to provide, that even sale with notice is no protection, if within six months of the failure of the bank. Each and all are subject to be sued at the instance of any and every bill-holder, in a separate action at Law, or on a joint bill in Chancery against all of them ; the jurisdiction of the two powers being concurrent as to the remedy. There can be but one satisfaction except for costs, and the stockholder can be charged only to the extent of his stock. Beyond this, he may defend himself; and on payment of this amount, there is an end of any further liability. *Lane vs. Morris*, 8 *Ga. R.* 486.

But it is suggested that there is an insurmountable obstacle to the practical operation of this construction. It may be stated thus: It is conceded that the same stock cannot be made twice liable. Suppose it has been conveyed and re-conveyed in different parcels, and through sundry persons, all of whom are responsible. The stock itself having no ear-marks, or other means of identification, how can it be determined whether it has, or has not, been before made chargeable in the hands of some other person?

Grant that the difficulty really exists, and that it is insuperable, the fault would then truly lie at the door of " the law-making, and not the law-administering power." And there we should be content to leave it. But fortunately, we are in no such strait. The perplexity can be obviated upon the principle of *proportion,* if not of *identification.* For instance, A owns 100 shares, and sells to B, who owns 100 more by subscription, making together, 200. B sells 50 shares to C. A recovery has already been had against A to the extent of his liability, and C is now sued on his 50 shares. Now it is unquestionably true, that it cannot be ascertained whether all, or what proportion of C's 50 shares once belonged to A. But it is known that one-half of B's 200 shares were obtained from A, one-fourth of which 200, he has transferred to C. The whole of B's shares being liable to 50 per cent. the 50 bought of him by C, is liable to the same per centage. Again, C sells 10 shares to D, who holds 10 more in his own right, which have never paid any thing. D's 20, provided C had not been sued, would be liable to 75 per cent. and so on, *ad infinitum.*

As to the equities *inter se se* of these stockholders, it is premature to agitate that subject. All may be equally liable to the bill-holders to discharge this common burthen, and yet be entitled to remuneration as against one another. We do not say that this is so.

The objection to the rule, that it practically multiplies the stock from one to four million of dollars, or some other large and indefinite sum, is founded in a total misapprehension of its operation. It may quadruple the number of *stockholders,* so far as

liability under the charter is concerned; but not the *stock.* *It* remains the same. The Legislature designed to make four persons instead of one, co-sureties or joint and several guarantors, for the ultimate redemption of the bills; that is, provided the remaining three failed to comply with the means of escape provided by the charter.

And is there any thing unreasonable in this? A land title passes through a dozen hands, each conveying with warranty. Upon eviction, the last vendee may sue any one or all of the previous vendors. And no one doubts either the Law or Equity of this procedure. Every grantor could have protected himself by selling with a quit claim deed only, but neglecting or refusing to do this, he is made liable. So of indorsers who fail to restrict their liability. Are they not all bound to the holder of the note? Why should not the assignors of bank stock be put upon the same footing, and subjected to the same regulations and restrictions?

Another position occupied in behalf of the defendant below is, that if the stockholders are liable at all, as *one* of all, or *one* of a *class,* that they are liable for $25 per share only ; and this to be proportioned to $250,000, the amount alleged to have been actually paid in on the stock ; and not for $100 per share, to be proportioned to $1,000,000.

In *Hightower vs. Thornton,* ( 8 *Ga. R.* 486,) and in *Lane vs. Morris,* (10 *Ga. R.* 162,) this Court held, and upon an extensive examination of the authorities, the opinion is fully sustained, that the sum specified in the charter, and not the amount paid in on the shares, constituted the capital stock of the corporation ; that this was expressly declared to be so by the Act itself, which likewise fixed the value of the shares at one hundred dollars each. It being our opinion then, as now, that the same rule of interpretation was in the mind of the Legislature in forming the *second* and *eleventh* sections of the charter. *Prince,* 125, 127. We forbear to enlarge upon this topic.

4th. But it is said that the plaintiff below was not entitled to his action at the time he brought suit, because the liability of the stockholder to the bill-holder was *ultimate,* and could not be

Thornton *vs.* Lane.

resorted to until all the assets of the bank and the unpaid capital stock, being seventy-five dollars per share, were called in and exhausted, which the facts proven in this case showed had not been done.

We feel the importance of the question here presented, and that it deserves grave consideration.

In the first place it is assumed, that this point is *res adjudicata;* and *Lane vs. Morris*, (10 *Ga. R.* 162,) is referred to by counsel in support of the assumption. That, it will be remembered, was an action by the bill-holder against the stockholder. Three questions were made for the decision of this Court. *First*, the Statute of Limitations ; *second*, the time from which the plaintiff was entitled to interest on the amount of bills sued for ; and *lastly*, the value at which the stock was to be estimated per share, viz : whether in fixing the amount of the defendant's liability under the 11th section of the Act, the valuation of the stock was to be reckoned at one hundred dollars, the charter price; or twenty-five dollars, the amount proven to have been actually paid in.

Upon the *second* point, the Court below instructed the Jury, that the plaintiff was entitled to receive interest on the amount of bills held by him, from the time of the return of *nulla bona* upon the *fi. fa.* against the bank. Upon this ground, this Court reversed the judgment of the Circuit Judge, and ruled that the stockholder was only liable to pay interest on the bills for which he was sued, from the time of the demand of payment thereof, by the bill-holder.

Could that judgment be justified, if not only all the assets of the bank, legal and equitable, but even the unpaid capital stock had to be first called in and exhausted, before the *ultimate liability* of the stockholder attached at all ? On the contrary, if this latter proposition be true, that suit, as well as this, was prematurely brought; and instead of allowing interest to be recovered from the time of its commencement, that being the only evidence of demand, we should have remanded the cause, with instructions to have it dismissed.

*Lane and Morris* then, is a decision directly upon the ques-

tion; and unless we are prepared to review and reverse it, is conclusive *against,* instead of *for* the plaintiff in error. And the *defendant* in error is entitled "to repose upon it with perfect security." For, was as justly remarked by Mr. Hill, "the consideration and discussion of this question was necessary and preliminary to the point then decided and in issue."

The inquiry then is, under the 11th section of this bank charter, pledging the person and property of the stockholder for the *ultimate redemption* of the bills and notes of the company, does the right of the bill-holder to sue accrue upon the exhaustion of his *legal* remedies against the corporation and its property, or is the obligation imposed upon him to pursue, collect and apply the *equitable* assets also, including the unpaid capital stock?

In other words, what was the *contingency* in the mind of the Legislature, upon the happening of which, *primary* liability was to be considered as exhausted, and the *secondary* to commence?

It is argued in behalf of the plaintiff in error, that this *ultimate* liability against the stockholders is attempted to be asserted while the assets of the corporation, the fund primarily liable, is accessible and amply sufficient to discharge the demand. That there is no analogy in the law, as applicable to a corporation and a natural person, or to the evidence of insolvency; that in case of natural persons, their property is usually tangible and visible; but that this is not only not true, as it respects corporations, inasmuch as that kind of property is not within the scope of their business, but often, as in the present case, they are expressly forbidden from owning lands, except for special purposes, and to an extent merely nominal.

A return of *nulla bona* against a bank, therefore, is paramount only to a demand and refusal, but nothing more; and does not establish, even presumptively, the *insolvency* of the corporation; that in order to maintain a suit against a natural person liable only in the second instance, a return of *nulla bona* as to his *equitable* estate would prove nothing as to the exhaustion of his real and personal property, and yet, that such would be more conclusive of the insolvency of the principal, than would be the return of *nulla bona* in the case before us.

Thornton *vs.* Lane.

That if demand and refusal to pay, on the part of the principal, is not sufficient to charge a natural person *secondarily liable*, and ultimate liability does not commence until the exhaustion of the estate of the principal, by judicial process, then nothing less than proceedings in Chancery would satisfy the demands of justice and of the Statute in this case.

That this personal liability clause is of modern date in bank charters. Formerly it was thought that the public was amply protected without it. There was not only the bills of exchange, promissory notes, &c. secured by the bank, dollar for dollar (at least) for its notes issued, the one bearing interest, the other not ; but also the amount of capital stock paid in, as well as the balance remaining due, which constitutes a fund for the redemption of the bills ; yet all of these primary bonds, Mr. Hill charges the creditors with having passed by, (like the Priest and the Levite in the parable,) and have gone over on the other side.

And to sustain the foregoing positions, *Crease and others against Babcock and others*, (10 *Metcalf*, 525,) and *Green against Breed and others*, (*Ibid*, 569,) are relied on.

Counsel for the defendant in error insists, on the other hand, that it is the *failure* of the bank which constitutes the event upon which the liability of the stockholder may be enforced; and that the Legislature has used the term *failure*, as synonymous with *insolvency*, as appears by reference to the 16th section of the charter, which is to be considered as part and parcel of the 11th section, under which this suit is brought ; and as it appears also by the whole body of legislation in this State, on the same subject matter. And that it is immaterial whether the stockholders are considered as principal debtors with the corporation, from the moment when they became stockholders and bills were issued, the right to enforce their liability being postponed ; or whether they became liable when the corporation refused to redeem, with a like postponement until judgment of forfeiture and the ascertainment of insolvency by sufficient legal process; or whether no liability whatever attached until insolvency was declared by judicial proceedings. Upon any hypothesis, it was *insolvency*, upon which the enforcement of the liability

rests; that is to say, the legal exhaustion of a primary liability, capable of being ascertained by legal proof. And that this supposition only, is consistent with the simple, easy and prompt remedy, furnished by the charter, for the enforcement of the ultimate liability imposed upon the stockholders.

The pleadings in this case show, and the averments in the declaration are supported by the testimony, that there has been a judgment of forfeiture against the bank—the appointment of a receiver—a judgment at Law against the receiver, for the recovery of this demand—which is tantamount to a judgment against the bank—a *fi. fa.* and a return of *nulla bona* thereon. The *insolvency* of the bank is thus established. It has no legal assets. This is shown by the return. The plaintiff in error traversed, by a part of his plea, the return; issue was joined, and the Jury returned a verdict for the defendant in error. To the rest of the plea, which alleged choses in action in the hands of the receiver and not subject to garnishment, equitable assets, and uncalled subscription for stock in the hands of the stockholders, the defendant in error demurred. Admitting then, the truth of the return, and that there is nothing on which a levy can be made, shall the creditor be now compelled to go into Equity, search out and collect any equitable interest which the defunct corporation may have had or claimed?

The Legislature, in enacting this law, in which an ultimate liability is imposed, upon the exhaustion of a prior liability, are to be understood as meaning legal liability. They legislate with reference to Law, not Equity. Legislative enactments are to be construed with reference to law, and legal rights and remedies.

All the analogies of the law are against the construction contended for by the opposite side. The assignee of a bond may sue the assignor upon his guarranty, after judgment *fi. fa.* and return of *nulla bona* thereon against obligor. The sureties' liability on a guardian or administration bond, is *ultimate;* still it is only necessary to obtain a judgment against the principal, cause a *fi. fa.* to issue, and procure a return of *nulla bona* thereon.

The Act contemplated a very simple and suitable remedy.

Thornton *vs.* Lane.

It never intended to force the small bill-holder to prosecute the corporation to the exhaustion of all its assets. The idea is extravagant and preposterous. The expense and delay would amount to a denial of justice. The Legislature, moreover, designed providing some additional security to the bill-holder. The right to go into Equity and subject the equitable assets, existed independently of the Statute. How inconsistent such an idea is, too, with the simple action of *debt* provided by the charter.

The only direct authority cited upon the defendant's side of the question, is one which we have had occasion to refer to heretofore for another purpose, to wit: *The Bank of the United States vs. Dallam and others*, 4 *Dana*, 574.

I have thus given a pretty full synopsis of the main grounds occupied in the discussion.

Much more importance has been given to the Massachusetts cases in *Metcalf*, than they are entitled to. It is true, that in *Crease* against *Babcock*, Chief Justice *Shaw*, in considering the question whether the holders of bills could have a *decree* for payment by the stockholder, before the assets of the bank had first been applied, uses this strong language: "shall the individual stockholders be charged when the bank is ready and willing to pay? This would be unreasonable. Shall they be charged when there are assets in the hands of the officers of the law, which assets are the first and natural fund applicable to the payment of such notes, and when, for aught that appears, such assets constitute a fund sufficient for their payment? May not the terms " shall remain unpaid " be fairly construed to mean, *ultimately unpaid*, after application of the proper funds? " .

And in the next case, of *Green vs. Breed and others*, the Court held, that when the assets of the bank are placed in the hands of receivers, the holders of its bills who do not present their claims to the receivers, cannot recover of the stockholders the full amount thereof, but only the balance which they would have been entitled to recover if they had proved the claims before the receiver, and obtained part payment.

It will be remarked, however, that these were proceedings *in*

*Equity*, at the instance of all the bill-holders, or a part of them, for themselves and all others standing upon a similar footing, and having similar claims ; and filed against all the stockholders, to enforce an ultimate liability clause, similar to that which we are considering. A Master had been appointed to receive and distribute the funds arising from the assets of the corporation. There was money in his hands to be divided among these creditors, and the Court held, and we think very properly, that being dependent upon the aid of a Court of Chancery to enforce their rights, its assistance should not be extended, if they neglected or refused to secure and apply the fund then in the custody of the Court for the payment of their claims. We have, and can have, no controversy with this decision.

Here the bill-holder does not ask the aid of a Court of Equity, to make his statutory remedy available. On the contrary, he deprecates its interference. He is not in a situation, therefore, to be compelled to do what is claimed to be equity. And yet, were it true even in his case, that there was cash in the hands of the assignee, which he might obtain upon application, or which he had refused to take when tendered, it would be questionable whether or not his demand against the stockholders would not be cut down *pro tanto*, upon plea and proof of these facts. This was virtually the Massachusetts case, but this is not the case made upon this record. Here, the *insolvency* of this corporation stands out prominently upon the pleadings. It had, in May, 1843, gone into liquidation and made an assignment of its effects. In the month following, there was a judgment of forfeiture, revoking its franchises, on account of its *failure*.

In the *Kentucky* case, in *Dana*, the Statute of that State imposed a liability on the individual stockholders for the debts of the corporation, upon failure of the corporate funds. Here was a clear case of *ultimate liability*. But the Court held, that a judgment, *fi. fa.* and return of no property in a suit against the corporation, was sufficient to enable the creditor to proceed against the stockholder personally.

In looking through all the cases of *ultimate liability*, under ev-

ery form of local legislation, it will be discovered, that this is the evidence invariably relied on to authorize a recovery in the second instance.

Here is an acknowledged right, for the enforcement of which, a plain Common Law remedy is provided.    Was it ever known, was it ever heard of before, that a party under such circumstances, was compelled to go into Equity, not to make that Common Law remedy available, but as a preliminary proceeding indispensably necessary to its enjoyment?    Such a proposition is, to our mind, utterly inconsistent with the fundamental object which moved the Legislature to afford to bill-holders more effectual security, by furnishing them with this easy, cheap and prompt remedy, under the charter, for the enforcement of the *ultimate liability* imposed upon the stockholders.

Resort is frequently had to Chancery, to obtain its aid to enforce a legal lien.    It cautiously interposes always, for this purpose. · It requires the applicant first to exhaust all of his legal remedies, before it will interfere.    But here the very converse of this doctrine is maintained.    And it is contended, that a creditor with a legal demand, and with ample means at his command, at Law to collect it, shall nevertheless desist, until he has first gone through a tedious and expensive proceeding in Chancery, to see whether he cannot discover something *which, by a decree,* may be appropriated to his claim.

Such a construction, in my humble judgment, rests on no foundation ; and would render utterly nugatory and destitute of advantageous operation, a provision resulting from the anxious solicitude of the Legislature, to protect the community from the ruinous consequences of a spurious currency, "instead of a shield to creditors, converting it into a sword to pierce them by alluring and then disappointing their confidence."

We look upon this *ultimate liability* clause, as neither more nor less in substance, than an indorsement in the *second instance,* by which the holder of a note is bound to prosecute the maker to a *prima facie* case of legal *insolvency* only, or to assign some satisfactory excuse for not doing so ; such as the non-residence, or removal of the party from the State.    And I give it unhesi-

tatingly, as my individual opinion, that an averment in the pleadings in the present case, supported by competent proof, showing the impossibility of obtaining judgment against the corporation, would entitle the bill-holder to proceed at once against the stockholder, without having instituted any previous suit whatever. The law does not require impossibilities ; and the secondary redress in this case was not designed to depend upon a condition precedent, which never could be performed.

It is urged with much earnestness, that no humane or wise Legislature ever could have intended to create a charter, imposing such burdens.

But the Statutes of some of the States are far more stringent than this, imposing a personal responsibility upon the members of a corporation in case of the neglect of a corporate body to pay the demands which it has incurred.

In Massachusetts it is enacted, that wherever any execution shall issue against any manufacturing corporation thereafter created, and such corporation shall not within fourteen days after demand made upon the President, Treasurer or Clerk of such corporation, by the officer holding the · execution, show to him sufficient real or personal estate to satisfy and pay the sums due on such execution, the officer shall sue and levy the same upon the *body* or *bodies* and *real* and *personal estate* of any member or members of such corporation. *Angell & Ames on Corporations,* 559.

And by this very charter, in case of excess of indebtedness, the Directors under whose administration it shall happen, are made *personally liable* for the same ; and may be sued at once, without compelling the creditor to go first against the corporation, notwithstanding the corporate assets are made liable for, and chargeable with said excess.

We doubt not that the consequences will be disastrous to some stockholders who may not be in actual default.   It was the misfortune of the innocent, to be associated with others who were unworthy of their confidence, and who abused their trust ; and who from unskillfulness or other cause, have entailed this ruin.   But now that the public is injured, whose duty is it to re-

Thornton *vs.* Lane.

sort to Equity, to search out and collect up the corporate assets, and force the delinquent parties to discharge their obligations? To preserve unimpaired, the security and benefit intended to be given by the Legislature to the creditor, we think the burden devolves upon the corporator who was entitled to all the gain, had any been made by this company; who had the right to interpose and arrest and control the management which has produced this mischief; we repeat it is for him, and not the bill-holder, to incur the expense and trouble of saving from the wreck, any pittance which may be left. " Better," say one of the Courts, the words of which we have already quoted, " that the corporators should become the victims of their own disasters, in preference to their being fatal to their unfortunate creditors."

[5.] The plaintiff, in his amended declaration, sets out, not as the *ground* of his recovery, but as *inducement* to the action, a judgment against Robert B. Alexander, as assignee of the bank. The defendant, by his 14th plea alleges, that there is no record of any such judgment, and prays judgment of the Court, and who puts himself upon the country. This plea was demurred to, and the demurrer sustained. And this constitutes the fifth exception, which it becomes necessary to notice.

The plea as it stands, is defective in form. The record set out in the declaration being of a *domestic* judgment rendered in a Court of *Record,* to wit: the Superior Court of Muscogee County, the plea should have concluded to the *Court,* only— the trial being by inspection and examination of the record. Where the record is of a *foreign* judgment, or if the Court which rendered the judgment be *not* a Court of *Record,* the plea should conclude, not with a verification of the record to the Court, but with a verification to the country; the issue being directly upon the *fact,* whether any such proceeding took place, and not upon the existence of any judicial memorial of it. *Stephens on Pleading,* 101, (*note l.*) *Dyson vs. Wood,* 3 *Barn. & Cresw.* 449; 3 *Mod.* 79.

[6.] The defect in *form,* however, was amendable. The verification to the country could have been stricken out; and this would have cured the irregularity. But the plea was de-

murrable for *substance*. It was not a plea to the *gist* of the action, which was the bills or notes of the bank, and consequently, did not lie. In an action of *debt* on a record, *when it is the foundation of the action*, the plea of *nul tiel record* is proper, either where there is no record, or where there is a variance in the statement of it. 2 *Sanders' Plead. and Ev.* 754. *Com. D. Pleader*, 2 *W.* 13, *and Record, C.*

[7.] It is next insisted that the judgment against Robert B. Alexander, as assignee of the bank, is void for want of jurisdiction in the Court rendering it—the defendant himself being the presiding Judge who awarded the judgment.

This is not really a question of jurisdiction. The *Superior Court* of Muscogee County unquestionably had jurisdiction, both over the person and subject matter. The objection is to the Judge who presided, on account of his being a party.

Passing by the propriety of attacking a judgment thus collaterally, and the fact that as assignee of the bank, Mr. Alexander was the mere agent of the law, having no personal interest whatever in the matter of litigation, we see no reason why a Judge should be incompetent to *confess a judgment* against himself in a suit to which he is a party in his own Court. It is a convenient practice. There is no *trial;* nothing *to decide* in the cause; and if a Judge has the misfortune to be sued in his own Court, for debt or other matter, against which he has no defence, no good reason occurs to us, why from a mere feeling of delicacy, he should be forced to call in the Justices of the Inferior Court or a Judge from another Circuit. The practice has been otherwise, and we should be reluctant to hold that a Judge was disqualified from acting to that extent in a suit to which he was a party.

The next error alleged is that at the time the plaintiff recovered his judgment against Alexander, that he was not *in fact* the assignee of the bank.

In support of this assignment, *Dougherty vs. Bethune*, (7 *Geo. Rep.* 90,) is referred to, as an explicit authority upon the very question.

So far as this Court held in that case, that a party is not

*estopped* from denying *any fact* which may be recited in a legislative Act, the opinion we still think is good law.   Such recitals are not *conclusive.*   But although they may not be conclusive, a decent respect for a co-ordinate department of the government requires the Courts to treat them as true until the contrary appear ; and such was the opinion of this Court in the subsequent case of *Beall vs. Beall,* decided in 1850.   8 *Geo. Rep.* 210.

We there say, "For we hold that *as to the facts* in this case, (meaning the facts recited in the legislative Acts legitimating the complainants) every Court must receive them as importing verity, to the same extent that the records of the Court are evidence to the Legislature or another Court of the matters of fact transacted in the Court, and of which the record is the memorial."   Could language be stronger?

[9.] But would Mr. Alexander himself, if in life, be allowed to dispute the fact that he was the assignee of the Bank? when in that character he had confessed a judgment against himself in a suit at the instance of the plaintiff!   We think most clearly not.   He would be forever foreclosed from denying the fact.   And it would constitute but a poor defence in his behalf to say, as counsel have undertaken to say for him, that he looked upon this and all other suits *at law* against him, "as simply ridiculous."

It is attempted to evade the force of this judgment by representing that the defendant was assignee by the previous appointment of the bank itself; and that he never did accept the legislative confirmation of this private appointment.

That he was sued as assignee, under the Act of 1843, and that he confessed judgment in that capacity, is demonstrable from this view of the transaction.   As assignee under *the deed,* he could only be sued in a Court of Chancery, and was amenable alone to that jurisdiction.   But the Act of 1843 provides that upon motion to *any Court* in which suit is or may be pending for or against this banking institution, the said assignee shall upon motion and notice to the opposite party or the attorney, be made a party to said suit; and that he shall have full

power to sue and be sued in his said character as assignee, for any demand due to or from said bank.  1 *New Digest,* 121.

I ask how sued ?   Not to answer for and distribute *the trust funds*, but to prosecute and defend *legal* demands.   Legislative sanction was not needed to conduct proceedings in Chancery.   Such a grant was wholly unnecessary for such a purpose ; " for his very appointment and acceptance of the trust made this an incident of his condition."   But it was needed to make him amenable *at Law.*

Suits *at Law* were, no doubt, pending at that very time against some of the banks for failure to redeem their notes.   To these it was necessary that the assignee should be made a party ; and the Act authorized it to be done.   He was made amenable at the same time to any others which might be instituted ; and the fact that Alexander could *not* be sued under *the deed*, *at Law,* and that he might be under the *Statute,* shows that the action was prosecuted under the Statute, and that his confession of judgment was made in that character.   It concludes him as well as the defendant below, as to the fact that he is the assignee.

But suppose that this inference is not warranted by the face of this proceeding and the law of the case.   Does this impair the force and effect of this judgment?   It is immaterial whether it was rendered against him by virtue of the private appointment alone, or under the legislative ratification of it.   In either view of it, it is still a valid judgment against him, as the legal representative of the defunct corporaration ; and it is good for the collateral purpose for which it was introduced, and in our judgment is conclusive against the assignee as well as against the present party, for all the legal consequences resulting from it, unless it can be impeached for fraud.

[10.] The next exception is founded on an alleged variance between the judgment and the execution.

This whole proceeding, as the record shows, was against Robert B. Alexander, as assignee of the bank.   The judgment entered up was, that " it is considered by the Court, that the plaintiff do recover of the defendant, *as assignee* of the Planters' and Mechanics' Bank of Columbus, &c."   The execution which

issued ran thus—"We command you of the goods and chattels, lands and tenements of Robt. B. Alexander, *as assignee* of the Planters' and Mechanics' Bank of Columbus, you cause to be made," &c.

In the judgment of this Court, the legal effect of the terms used, is precisely the same. Both the judgment and the execution are against the property of the bank in the hands of the assignee. And even if the alleged variance between the judgment and the execution existed, it is an irregularity merely, which is clearly amendable; and one which does not vacate the *fi. fa.* The process is good until set aside, and this can only be done at the instance of the party to it, and in a proceeding directly instituted for that purpose.

[11.] The next exception is that the Sheriff made his return of *nulla bona* on the execution previous to the return day of the suit.

In *Lichten & Barker* against *Mott,* 10 *Geo. Rep.* 138, this Court held that for the purpose of fixing bail, the *ca. sa.* against the principal must be returned to the next succeeding term of the Court from which it issued; and that no *intermediate return* is sufficient to fix the bail; neither can it be regarded as the return required by law. With this decision we are still satisfied, notwithstanding the conflicting authority read from the Courts of sister States, whose Statutes are dissimilar to ours upon this subject.

There is a manifest distinction, however, between a *ca. sa.* and a *fi. fa.* In the former it is the duty of the Sheriff to retain the process in his hands until the next term of the Court, to enable him to arrest the defendant if practicable; and to enable the bail to surrender his principal in his own discharge to the custody of the officer at any time before final judgment. Not so with the *fi. fa.* The Sheriff must make search in time to levy on the property of the debtor and bring it to sale before the next term of the Court to which the process is returnable; otherwise he will make himself personally liable.

Besides, in *Lichten* and *another vs. Mott,* it did judicially appear that the *ca. sa.* although returnable to May Term, 1847, of

the Superior Court from which it issued, was returned and filed in the Clerk's office on the 21st day of April, 1847, the same day on which the entry of *non est inventus* was made. Here, the *fi. fa.* issued the 18th day of February, 1848, and was executed on the 17th day of March, thereafter. But it does not appear from the record, but that the return of the execution was in fact made on the first day of the next term.

[12.] In *Igod & Addison et. al.* (5 *How. Miss. Rep.* 432,) the Court of Errors held that the return of the Sheriff upon the execution of "no property found," furnishes no evidence that the process was returned into Court on that day; that this is matter *in pais ;* and that parol evidence was admissible to show *when* the execution was returned to the Clerk's office.

[13.] The legal inference in this case is, that the Sheriff, after making the entry of *no property*, put the excution in his pocket and kept it until the proper return day. In other words that he did his duty.

[14.] In *Wilcox vs. Ratliff*, (5 *Black's Rep.* 561,) this identical objection was made, that the officer should not have returned the execution *nulla bona*, without taking the time allowed by law to find property. But the Supreme Court of Indiana held that there was no ground for this objection; that when the officer having in his hands a *fieri facias* has made one full examination for goods without success, he is at liberty to return the execution, *nulla bona.*

[15.] Plaintiff during the progress of the trial, offered to introduce Abraham B. Ragan, as a witness in said cause; and the defendant objected thereto, on the ground that the said Ragan was a stockholder in the bank; which objection was overruled. And to this ruling the defendant excepted.

We see no objection to the competency of Mr. Ragan. He was a stockholder himself, and offered as a witness in a suit against another stockholder. He may not have been a good witness for the defendant; we do not say that he would not be ; that he was admissible for the plaintiff, we have no doubt.

As all the other assignments grew out of the charge of the

Court, we will transcribe that *entire ;* and then dispose of each specification in its order.

The plaintiff having closed his case, and the defendant introducing no evidence, the same was argued before the Jury, and the Judge charged, amongst other things—" That the transfer of stock in the stock-book of said bank to the defendant, was *prima facie* evidence of his ownership thereof; and that it was not necessary to the plaintiff's recovery that he should prove the same by other evidence ; or that he should prove the defendant's purchase or subscription for the same, or his assent or knowledge of said transfer in his name or to him; that said transfer being made on the books of said bank, kept and used for that purpose, his assent thereto would be presumed; and that it was incumbent on the defendant to plead and prove that he did not own the same, and that it was for the Jury to decide (if at all) how far the evidence had rebutted such presumptive evidence on the said transfer book, and if it had been rebutted, then the defendant was not liable as the owner of said stock.

He further charged the Jury, that the defendant was liable to bill-holders to the extent of the value of each and every share of stock held by him, and in proportion as the number of his shares is to the whole number of the shares of the bank; and that said defendant, after paying bill-holders in this proportion to the extent of the value of each and every share at $100 per share, could plead said payment in discharge of further claim or liability to other bill-holders, and that it was not necessary to the said plaintiff's recovery in his action that he should aver and prove the extent of notes issued by said bank and outstanding; that whether the same was $250,000, 1 million, or 3 millions, it made no difference as to defendant's liability; that when the defendant had paid bill-holders to the extent of his liability, such payment was ample protection against the claim upon him of other bill-holders ; that the amount of bills and notes unredeemed by said bank was not an element in the calculation of the extent of the defendant's liability to the plaintiff; and if it was, it was 'matter for plea and proof by said defendant, and not necessary to be averred and proven as part of said

plaintiff's case, or in any manner necessary to his recovery; that defendant's liability as stockholder to said plaintiff accrued whenever his (said plaintiff's) legal remedies against said bank for the payment of the bills held by him were exhausted, to wit: a judgment against the assignee and return of *nulla bona*; that it was not necessary for plaintiff to go into Equity to exhaust equitable assets or to pursue the assets in the receiver's hands (if any) before he could go upon the stockholders for a *pro rata* share of his debt.

That the Act of the 23d December, 1843, expressly appointed Robert B. Alexander assignee of said Bank, and that the same being a public law, it was not incumbent on said plaintiff otherwise to aver and prove said appointment, and that the judgment against said assignee, *fi. fa.* and return of *nulla bona* thereon, was equivalent to the same being against said bank, and that a return of *nulla bona* against said assignee on the said *fi. fa.* was *prima facie* evidence of the exhaustion of the property of said bank, but was not conclusive. If the defendant had shown that at the time of said return, there was property of said bank subject to levy and sale under said *fi. fa.* then the plaintiff must dismiss the suit against the defendant, and proceed against said property, and could not maintain his action against defendant until he had exhausted said property.

That the return of *nulla bona* on said *fi. fa.* against the assignee even though made before the return day of the *fi. fa.* was *prima facie* evidence of there being no property upon which to levy the same, and that it was not necessary that the Sheriff should have retained in his hands said *fi. fa.* until the return day thereof.

That if mere possession of the banking house and lot was relied upon by the defendant, as *prima facie* evidence of the title in said bank or its assignee, then such possession must have continued up to or subsequent to the rendition of the judgment against said assignee. That in order for such possession to be any evidence of title, it was incumbent on the defendant to prove the same in said bank or the assignee, or that the person in possession held under him or subsequent to the date of the judgment.

Thornton *vs.* Lane.

That the Court was constituted by law, the Judge of the Law in civil cases; that the Jury was bound to regard the law as stated by him, to be the law of the case ; that if he decided wrong, and the law provided a remedy or correcting tribunal, then his decisions might be reversed and corrected.   If there was no corrective provided by law, then the parties would have to submit; but in either case, it was wise and proper that the Judge should be entrusted with the power to determine the law, and that it was the province and duty of the Jury to apply the law given in charge to them by the Court, to the evidence, and find accordingly ; that in this case he had given them the law as he understood it.   The counsel on both sides had stated their views of the law and had claimed to give their honest opinions ; the Court had no doubt they were sincere and honest in the expression of their opinions ; he claimed to be equally so in the expression of his: that he was certainly indifferent in feeling to the parties, and had no earthly interest in the case, although he regretted to say that he had the evening before received through the Post Office, an anonymous letter, charging him with corruption, and being the partner of Mr. Dougherty in these bank cases, and threatening personal violence to him ; that he hoped that none of the defendants to said bank cases had written that letter; one thing was certain, no honorable man had written it; those were most apt to be suspicious who were themselves corrupt ; he had important official duties to perform   under the sanction of an oath ; he would perform them fearlessly and to the best of his ability, no matter who was pleased or displeased thereby."

At the conclusion of the charge, and at the hour of 9 o'clock, A. M., the Jury retired to consider of their verdict, and after remaining in their room until 2 o'clock, P. M., again returned at their own request, to the Court room, to receive the further instructions and charge of the Judge, and reported through their foreman, that they disagreed as to the effect of the testimony of the witness Ragan, with regard to the assets turned over to him by W. Lee, and whether said testimony was ruled out or was before them for their consideration.

The Court then and there further charged the Jury—"That said evidence was not ruled out, and was before them; and that the legal effect thereof was not to defeat the recovery of the plaintiff, unless it proved property, the neglect of levy and sale under the *fi. fa.* against Alexander, as assignee, and that a return of *nulla bona* on said *fi. fa.* was evidence of the insolvency of said bank, sufficient to give bill-holders their remedy against stockholders; and that the mere fact that Ragan received notes from Lee, was not sufficient to prove the same the assets of said bank, but that to establish the fact that they were the property of said bank, it must be proved that they were held by the bank or had been derived from a previous assignee of the bank, as assets of the bank."

To all of which charge, and to each of the instructions as severally and specifically given, the defendant by his counsel excepted.

The more important portions of this charge having been already considered and disposed of, it only remains to examine certain parts of it upon which error is specially assigned.

[16.] 1st.—The first question which arises, is as to the sufficiency of evidence. The transfer-book of the bank had been given in evidence; the defendant had pleaded that with the exception of one hundred shares, to wit: 50 shares transferred to him by M. W. Turner, 20th February, 1838; and 50 by A. B. Ragan, transferred March 28th, 1838, he never owned or held any other or further number of shares in said bank; and that if the books of the bank showed any other or further transfer of shares to him, to wit: a transfer on the 19th of May, 1838, by Hines Holt, of 188 shares, and Walter T. Colquitt, of 188 shares, transferred to the name of the defendant; that the said transfer was made by the said Holt and Colquitt at the instance of, and for the sole and exclusive benefit of one Daniel McDougald, and without the knowledge and consent of the defendant, and that the same was so known to be the fact by the directors and officers of the bank, and that he, the defendant, never did assent to the same. That he never voted on said last mentioned stock, nor did any other act in relation thereto,

by which his assent to said transfer could be implied; nor was he in any manner liable therefor.

The testimony of Ragan was that he was the Cashier of the Bank when these transfers were made; that the book offered in evidence was the transfer-book kept by the bank, for the purpose of transferring stock from one stockholder to another on said book; that he transferred to the defendant the 50 shares the 28th day of March, 1838, mentioned on page 35; and that he recognized his signature to the other transfers made by Hines Holt, Jr., and W. T. Colquitt, each of 188 shares, on the 19th day of May, 1838; and that he had no doubt they were made by Holt and Colquitt, as it was his duty as Cashier to witness such transfers; and he was not in the habit of subscribing his name as witness unless the transfers were made as recorded; but that he had no recollection of the same, or that the defendant was or was not present when the same were made, or then or afterwards assented to them, or that he had any knowledge thereof.

Upon this evidence the charge of the Court was predicated; namely, that the transfer of stock, in the stock-book of the bank, to the defendant, was *prima facie* evidence of the ownership thereof; and that it was not necessary to the plaintiff's recovery that he should prove the same by other evidence, or that he should prove the defendant's purchase or subscription for the same, or his assent or knowledge of said transfers in his name or to him. That said transfers, being made on the books of the bank kept and used for that purpose, his assent thereto would be presumed; and that it was incumbent on the defendant to plead and prove that he did not own the same; and that it was for the Jury to decide (if at all) how far the evidence had rebutted such presumptive proof on the said transfer-book; and if it had been rebutted, then the defendant was not liable as the owner of said stock.

This objection turns upon an alleged improper direction by the learned Judge, upon the sufficiency of the proof to show, *prima facie*, the acceptance by the defendant of the transfer of the three hundred and seventy-six shares of stock by Holt and

Colquitt; and it is undoubtedly one of a very important char-
acter, as it involves the practice of Stock Exchange generally.
I have no doubt that the understanding of the country is, that
bank books are admissible to prove the transfer of stock.

[17.] And although this transfer be neither literally and tech-
nically a " deed, bond, bill, single or several note, draft, receipt
or order," in the language of the Judiciary of 1799, still we are
strongly inclined to hold that if this defendant was sued upon
this transfer of stock, from which his assent and acceptance are
implied, that he ought not to be permitted to deny that this was
his act, unless he would make affidavit to the truth of his answer
and defence. This would certainly be in accordance with the
spirit, if not the very letter of the Statute. This transfer, if *bona
fide*, is a contract of purchase between him and the former own-
ers, for this stock, which is reduced to writing by the Cashier
on the books of the corporation, kept for that purpose. If the
action against him was upon this contract, would the defendant
be permitted to deny that it is his act, *or deed*, if you please,
except under oath? And would not this construction, imposing
as it does, no undue burden upon the party, obviate a difficulty
which may otherwise greatly embarrass the Stock Exchange
business? In ninety cases out of a hundred, the transfer on the
books of the corporation is the only evidence in the matter;
and when sought to be made liable upon this transfer, while he
ought not to be required to prove a negative, to wit: that he
did not agree to the transfer; still it is not unreasonable to hold
that the defendant should verify his plea of repudiation. The
onus would then be cast upon the opposite party, to prove that
the transfer was made with the knowledge and consent of the
defendant.

But there is another view of this question. By the charter, a
book was to be kept for the purpose of transferring the stock of
this bank. This book, the charter declares, shall be subject to
the inspection of the stockholders. Mr. Thornton, the defend-
ant, was the owner of a hundred shares of the stock of this
company, at the time of this alleged transfer from Colquitt and
Holt. In a contest between him and the bill-holder, will he not

Thornton *vs.* Lane.

be bound by this transfer, the entry of it being made on the books of the bank by the cashier of the corporation of which he was a member, and free access being provided to him for the purpose of inspection? It would seem that he cannot be deemed a stranger to the transaction; especially with one who is a *stranger* to the *corporation.* Upon this point I have felt, I confess, more embarrassment than any other contained in the record.

[18.] 2d. The next complaint is, that the Judge erred in that portion of his charge in which he said to the Jury, that if mere possession of the banking house and lot was relied upon by the defendant, as *prima facie* evidence of title in the bank or its assignee, then such possession must be continued up to, or subsequent to the rendition of the judgment against said assignee; that in order for such possession to be any evidence of title, it was incumbent on the defendant to prove the same in said bank or the assignee, or that the person in possession held under him, at or subsequent to the date of the judgment.

This charge was founded upon a part of the 10th plea, which was not demurred to, and the evidence of A. B. Ragan.

The portion of the 10th plea referred to was, that " there was real and personal estate belonging to the Planters' and Mechanics' Bank of Columbus to the value of fifty thousand dollars, upon which the plaintiff had not levied his execution; and as part of said property, there was the late banking-house and lot occupied and owned by said bank at the time of the forfeiture of its charter, and a large three-story brick building, at the upper end of Broad street in the City of Columbus, known as lot No. 186, and the north half of City lot No. 183, which was of the value of $50,000, and subject to levy and sale under the plaintiff's demand.

The evidence of Ragan, in reference to this matter was, that the bank in 1838, built a banking-house in the City of Columbus, on the west side of Broad street, and occupied the same up to the time of its final failure in the spring of 1843. Since that time, the banking-house had been in the possession of John

Banks, the agency of the Bank of Brunswick, Alfred Iverson, and others.

The objection to the charge is, that it was hypothetical and wholly unauthorized by the plea and proof; there being no pretence in any part of the case, that the title to this banking-house and lot and to the other real estate named, was ever in the assignee of the bank. Moreover it is argued, that the banking-house and lot was proven, *prima facie*, to be the property of the bank; and such property as was by law and the repeated adjudications of this Court, the subject of levy and sale, under the *fi. fa.* against the bank. That Ragan having proven possession and occupancy of the bank up to its final failure in 1843, in the absence of other evidence, this was title; and such as subjected the property to seizure and sale under the execution.

It is admitted that the charge of the Court may have been well enough, if there had been a levy and claim, or even any other title set up in any third party. But having shown possession and occupancy up to the time of final failure in 1843, it ought to have been left to the Jury to say, even if a transfer had been relied upon to any party, and especially to some of those proven to have followed in mere possession, whether such transfer, *after final failure* in 1843, could be made, except *in fraud* of the rights of *creditors*.

It will be observed, that by the return of *nulla bona* upon the execution against the assignee of the bank, the plaintiff had established a case of *prima facie* insolvency against the corporation, so as to entitle him to proceed against the stockholder, under the *ultimate redemption* clause in the charter. The proof offered in relation to this banking-house was to rebut the evidence of the insolvency of the bank, and to show that there was property belonging to it, subject to the plaintiff's demand. There was no evidence of *title* offered. *Possession* alone was relied on to prove property in the bank. Wherein does this case differ from that of a levy and claim, in which issue, it is admitted, the charge would have been unexceptionable?

But in any event, was not the learned Judge right in giving

the instruction which he did to the Jury? Relying upon occupancy alone as the evidence of title, ought not the possession to have continued in the bank, or its assignee, up to or subsequent to the rendition of the judgment against the assignee? or was it not incumbent on the defendant below to prove that Banks, the Brunswick Bank and Iverson, held under the corporation, or its legal representative? We think so, most indubitably.

But it is said that the charge was unauthorized, inasmuch as there was no pretence that the banking-house was ever in possession of the assignee.

Concede that to be so, the law, as an abstract proposition, was nevertheless correctly submitted; and it does not lie with the defendant to find fault because the charge was more favorable than he asked for, or even than the testimony authorized. It is true, that there was not a particle of proof to show that Alexander, the assignee, was in the occupancy of this property, or that those persons who were in possession since the failure of the bank, held under the assignee. And yet, the Court charges, that if the Jury should find either of these facts to exist, that then the verdict should be for the *defendant.* Had the verdict been the other way, we must say there would have been good cause of exception on the other side.

Nor is it true, that the testimony established that the banking-house and lot was, *prima facie,* the property of the bank, so as to subject it to levy and sale at the instance of the plaintiff's demand. It may have been in the occupancy of the bank up to the time of the *failure* in the spring of 1843, and conveyed subsequently to that time, to some of those persons who were afterwards in possession, according to the evidence of the witness Ragan, or to any body else; and such transfer, if *bona fide,* would have been good against *Lane,* the creditor.

In *Carey vs. Giles,* (10 *Ga. R.* 9,) this Court held that an assignment made by an *insolvent bank* to pay an existing debt to a creditor, is neither void by the general law, nor by the Act of 1818, even where the effects assigned are larger than would be reasonably sufficient to pay the debt, and accompanied with a

stipulation that the excess shall be returned to the bank; but on the contrary, that such transfer was, *per se*, valid.

In one of the earliest decisions made by this Court, it was held, that the fact that a man is *insolvent* when he transfers his effects, does not make the conveyance void; but that he may sell his estate; the Act of 1818 not divesting him, because he is *insolvent*, of the right of dominion over his property. 1 *Kelly,* 157.

Artificial persons or corporations enjoy the same right in this respect, as natural persons. And notwithstanding the soundness of the principle in regard to preferences, as applied to corporations, is *doubted* in *Robins et al. vs. Enly et al.* (1 *Smedes and Marshalls' Chancery,* 208, 259, 265,) and a general assignment by a bank, *though admitted to be valid,* was declared in *The State vs. The Real Estate Bank,* (5 *Pike,* 596, 607,) to be a good cause of forfeiture of its charter; still, that a bank or other corporation, in a state of insolvency, possesses the same right that an individual possesses to make a transfer, is settled by a conclusive weight of authority. *Catlin vs. Eagle Bank,* 6 *Conn.* 233, 242. *Savings Bank vs. Bates,* 8 *Ib.* 506, 512. *The Bank of Maryland,* 6 *Gill. & Johnson,* 206, 219. *Bank U. S. et al. vs. Huth,* 4 *B. Monroe,* 423, 429. *Dana vs. The Bank of the United States,* 5 *Watts & Serg.* 224, 243. *Hopkins et al. vs. The Gallatin Turnpike Co.* 4 *Humphreys,* 403, 410. *Connay et al. ex parte,* 4 *Pike,* 305, 353. And see opinions of *Mr. Kent, Ib. App. XII. and in* 6 *Humphreys,* 532.

If, then, the presiding Judge had left it to the Jury to say, as it is insisted he ought to have done, " even if a transfer had been relied upon to *any party,* and especially to some of those known to have followed in mere possession, whether such transfer, *after final failure* in 1843, could be made, except in fraud of the rights of creditors," (*Brief,* 105,) it would have been misdirection; the law being well settled that this may have been done.

[19.] 3d. The next ground of error is, as to what transpired when the Jury returned into Court, after having retired to their room, to receive at their own request, further instructions as to

the effect of the testimony of the witness, Ragan, with regard to the assets turned over to him by Mr. Lee, and to inquire whether said testimony was ruled out, or was before them for their consideration.

The Jury were informed that the evidence was not ruled out, but was before them; and that the legal effect thereof was not to defeat the recovery of the plaintiff, unless it proved property the subject of levy and sale under the *fi. fa.* against Alexander as assignee, and that a return of *nulla bona* on said *fi. fa.* was evidence of the insolvency of said bank, sufficient to give bill-holders their remedy over against stockholders. And the mere fact that Ragan received notes, &c. from Lee, was not sufficient to prove the same the assets of said bank, but that to establish the fact that they were the property of said bank, it must be proved that they were held by the bank, or had been derived from a previous assignee of the bank, as assets of the bank.

That it is error in the Court, either in its charge or during the progress of a case, to express, or even intimate to the Jury, an opinion upon the facts or upon what has or has not been proved, we readily grant. Still, it is the undeniable privilege, and even duty of the Judge, when called on, as he was by the Jury in this case, to state the *legal effect* of testimony. We are inclined to think—the notes in question being turned over by Joseph A. L. Lee, to Ragan, as the assignee of the bank—that, without further proof, perhaps they were, *prima facie*, the property of the bank. But suppose they were, Mr. Ragan, who had been appointed receiver in the place of Mr. Alexander, took them in his official character of receiver; and these assets, if collectable, and the property of the bank, could not be reached and made liable to the plaintiff's demand by process of garnishment or any other *legal means* at his command; and consequently could not defeat his remedy over against the bill-holder. See the case of *Field vs. Jones and Schley*, decided the present term.

[20.] 4th. It is assigned as error, that the Court said to the Jury, " if he decided wrong and the law provided a remedy or correcting tribunal, then his decision might be reviewed and corrected."

It is urged that between this point in this case and the simi-
lar point in *Monroe vs. The State*, (5 *Ga. R.* 86,) that there is not
a shade of difference ; and that this Court decided in the case
of *Monroe*, that it was error in the presiding Judge to remind
the Jury of the existence of a Supreme Court to which the de-
fendant could carry his case up, &c.

So far from the decision in the Monroe case, and the reasons
for it, amply and fully sustaining this assignment, we think they
differ in *toto cœlo*.

In *Monroe's* case, the Court, after admitting certain testimony,
in its charge to the Jury stated, that he greatly doubted the pro-
priety of having done so.   Still that having been received, the
Jury were bound to consider it in making up their verdict; and
then added, that if error had been committed through haste or
inadvertence, that the defendant could take the case up to the
Supreme Court and have it corrected.

And this Court being of the opinion that the evidence refer-
red to by Judge *Warren*, was both legal and proper, we felt con-
strained to say that its force should not have been weakened by
this intimation from the Bench.   That the remark, however well
intended, was calculated not only to lessen the sense of their
own responsibility, but at the same time to convey to the Jury
the idea, that the proof already before them was not sufficient
to acquit the defendant.   This was the opinion of this Court in
that case, and the reasons for it.   In the case before us, the
Court after stating that he was constituted the Judge of the law
in civil cases, and that the Jury were bound to regard the law as
stated by him to be the law of the case, added that if he de-
cided wrong, the Supreme Court alone could correct his errors.
Meaning thereby, to give the Jury to understand, that it was for
the appellate tribunal, and not for them, to review his judg-
ments.

The two cases are as widely apart as are the poles from each
other.   In the one, the reference to the Supreme Court was,
under the circumstances, improper and calculated to injure the
party.   In the other, it was altogether harmless, to say the most
of it.   Perhaps it was not amiss to remind the Jury, that the

Thornton *vs.* Lane.

privilege and responsibility of rectifying the errors of law committed by the Court, did not rest with them, but that the Constitution of the State had conferred this power elsewhere. After all, the new trial in Monroe's case was not awarded on this ground, notwithstanding it was considered as an irregularity by this Court.

[21.] 5th. It is further insisted, that in the particular charge under review, it was error in the Judge to say to the Jury that, " the Jury was bound to regard the law as stated by him, to be the law of the case."

It will be admitted by all who have read our Reports, that no Court in this country has gone farther than we have, to see to it, that the Judge did not invade the province of the Jury.

[22.] Even where verdicts have been manifestly against the weight of evidence, still we would not suffer them to be disturbed, unless they evinced by their gross injustice, passion, partiality or prejudice. We believed that the law conferred upon them this power ; that to the Jury, as a favorite and almost sacred tribunal, was committed exclusively, the task of examining the testimony and passing upon the merits of the case, according to their opinion of the facts and circumstances ; that we were bound to presume in favor of the purity of their motives, and that it was not until the result of their deliberations was such as to shock both the understanding and the moral sense, that the Courts were at liberty to interpose and control their verdicts. *Beyond this we will not go.*

[23.] For while we have always respected and secured to the Jury, to the fullest extent, the right to decide upon the facts, we will take equal care that the rights of the Court to decide the law, shall never be impaired or questioned by the Jury. Establish a contrary rule and there is no longer any certainty in the law. The peace of the country, the security of life, liberty and property, are undermined and destroyed. A state of things would ensue which every good man should deprecate.

The extraordinary power claimed for the Jury, is invoked from the comprehensiveness of the terms of the oath administered to a Special Jury. They are sworn " a true verdict to

give, according to equity and the opinion you entertain of the evidence produced to you, to the best of your skill and knowledge," &c.

[24.] By looking back through the old Statutes, this form of oath, it seems, was that which was originally prescribed for Juries in *Equity* causes proper ; and for that purpose it was framed with technical accuracy and aptitude.   Its phraseology is not exactly suitable to *appeal* causes on the Common Law side of the Court.   But take it as it is, and what is the obligation which it imposes ?   To give a verdict according to some vague, undefined and undefinable opinion which the Jury may entertain of Equity ? Certainly not.   But according to a system of jurisprudence, governed by established rules, and bound down by fixed precedents, from which the Jury are not at liberty to depart, however liable to objection these rules and precedents may be, in their judgment.   As to the facts and circumstances of the case, they are to be governed by the *opinion* they may entertatn of the evidence. But as to the *law*,—for law and equity in the oath are convertible terms—they are not at liberty to theorize or to speculate as to that.   This they must receive at the hands of the Court, and administer it faithfully.   And new trials will be granted so long as their verdicts are contrary to it.

[25.] It would be strange indeed, if the substitution of the word " *equity* " for *law*, in the oath directed to be administered to a Special Jury, should work an entire revolution in the judiciary of the country !   Had the Legislature intended making such a change, they would have effected it in some more explicit mode.   Such tremendous consequences would not have been suspended upon the doubtful construction of the Juror's oath.

It is our settled conviction, that the rule which is co-eval with jurisprudence itself, still exists here in its utmost latitude and vigor, viz : that it is the province of the Court to determine the law ; and that if Juries will take it on themselves and decide differently from the Court, a new trial should be granted *toties quoties*.

6th.  The last complaint which we shall notice is, what the counsel is pleased to characterize as one of the most remarkable features in the charge, namely, the reference which the

Thornton *vs.* Lane.

Judge made to his having received through the post office, an anonymous letter, charging him with corruption and being the partner of Mr. Dougherty in these bank cases, and threatening him with personal violence.

I admit that a Judge, when he enters the temple of justice, should say to his passions (if possible) as Abraham did to the young men, when about ascending Mount Moriah: " abide ye here, while I go up to worship." But harrassed and baited, as Courts too often are, by the angry strifes and conflicts of counsel, who is sufficient for these things? After all, we look upon the remarks which fell from our learned brother on this occasion, as more a matter of judicial *taste and manners* than of *law ;* and we know of no safer depository for questions of this sort, than the accomplished *gentleman* who presides over the Chattahoochee Circuit.

.We believe that we have covered every point, great and small, raised upon this record. We have intended to do so, and the conclusion of the whole matter is, that the .judgment below is right, and should be affirmed.